TYMKOVICH, Circuit Judge.
Stan Taran Ford was convicted for illegally selling or possessing a machine gun. Ford’s primary defense at trial was entrapment. After he was convicted, Ford alleged the government failed to produce multiple emails sent between him and the informant. The district court found that three undisclosed emails existed, but denied a post-trial motion to set aside the conviction, concluding that these emails would not have affected the outcome of the trial. We agree with the district court that in light of all the evidence presented at trial, the emails were not sufficiently material to cast doubt on the jury’s verdict.
Having jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM the district court’s judgment.
I. Background

Factual Background

Colorado’s Joint Terrorism Task Force (JTTF)[1] obtained a tip in late 2003 from Ford’s co-worker Jimmy Hee that Ford was trafficking in automatic weapons and engaging in other suspicious activity. According to the tip, Ford, a Denver firefighter, owned illegal fully-automatic firearms and was attempting to procure sensitive military communications equipment. Ford also allegedly asked Hee about a NATO conference in Colorado Springs and a planned visit by Secretary of Defense Donald Rumsfeld to Fort Carson.
As part of their investigation, the JTTF recruited Keith Heavilin to work as an informant. Heavilin had previously worked as an informant in several other JTTF investigations. Prior to working on this case, Heavilin had also served in the military for twenty-one years and was em *978 ployed by the security division of the U.S. Department of Energy for sixteen years.
In February 2004, Heavilin struck up a conversation with Ford at a gun show in Denver, where Ford was an exhibitor. Ford soon perceived Heavilin to be a friend. Over the next year and a half, they had over 100 contacts with each other via phone, email, and in person.
During this time, Ford sold Heavilin three machine guns. The first transaction occurred on April 22, 2005, when Ford sold Heavilin a Sten machine gun. The next transaction occurred several months later, on August 2, 2005, when Ford sold Heavi-lin a H & K machine gun. Finally, on November 21, 2005, Ford sold Heavilin a fully automatic AR-15 machine gun.[2]

Pretrial Proceedings

Ford was charged with three counts of knowingly transferring or possessing a machine gun, in violation of 18 U.S.C. § 922(o).[3] The three counts were based on the April 22, August 2, and November 21 machine gun sales.
Before trial, Ford filed a motion to obtain the government’s case files pursuant to Brady v. Maryland 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). During a hearing on this motion, Ford specifically requested any emails between Heavilin and himself. Ford did not have access to the emails because the government seized his computer when he was arrested. Although the government produced several emails, Ford told the court he believed more emails existed, and this evidence would support his defense. The government responded by stating it was not aware of any additional emails, but it agreed to recheck its records. The prosecution did not provide Ford any additional emails prior to trial.

Entrapment Defense at Trial

At trial, Ford did not deny he sold Heavilin the three machine guns. Instead he argued he had been entrapped by the government.
In support of the entrapment defense, Ford argued Heavilin continuously pressured him over a long period of time to acquire and sell the three machine guns— crimes Ford was otherwise unwilling to commit. In particular, Ford’s counsel highlighted the substantial number of contacts Heavilin initiated with Ford. The attorney summarized these contacts in a spreadsheet presented to the jury, and repeatedly referred to them during trial. For example, in his closing argument counsel stated the following:
This is the exhibit that you have seen, at least the first page, you have seen it a lot. But what you need to focus on for a minute is the sheer number of contacts initiated by Keith Heavilin....
And what is he calling all of these times to do? He is calling all of these times to persuade and talk a man into selling him a gun who told him, no, I don’t sell automatic weapons, I thought you were talking about a semiautomatic weapon, I can’t help you. That is call after call, meeting after meeting, for one purpose only; to make him think you are a friend, and to persuade or talk him into selling you an automatic weapon.
*979 R., Vol. XV at 1832-33 (emphasis added). As counsel explained, “This exhibit is a roadmap for entrapment.” Id. at 1835.

Chronology

During the trial, both the prosecution and the defense highlighted the substantial interactions between Ford and Heavilin. From the time they first met on February 7, 2004, to the time of Ford’s arrest, the two communicated by phone, email or in person over one hundred times. Up to the first machine gun sale on April 22, 2005, Heavilin and Ford communicated fifty-nine times. Then, between the April 22 and August 2 transactions, they communicated another twenty-five times. Finally, between the August 2 and November 21 sales, they communicated nineteen times. Most of these communications were by telephone, although they met in person thirteen times and sent seventeen emails.
The following is a chronology describing interactions that occurred after the second sale.[4] The bold text reflects information contained in the missing emails. The remaining text is based on the trial record.
8/14/2005 Ford emails Heavilin.
9/21/2005 Heavilin calls Ford, and Ford calls him back seven hours later. Ford tells Heavilin he is worried about something related to the gun show. Ford repeatedly tells Heavilin “I played by the rules a hundred percent, I haven’t done anything wrong.” R., Vol. IX at 165.[5]
Unspecified time before 10/5/2005 First missing email: Heavilin emails Ford and asks him about a third machine gun.
10/5/2005 Ford sends the following reply to Heavilin[6]:
Just returned from out of town. Social sounds good. I’ll call you and set something up over next couple of days. Not any good computer[7] deals out there right now. I think rising costs are to blame. Just keep watching the big store ad’s [sic] for a sale.
Should be able to call in the next couple of days.
R., Vol. I, Doc. 179 at 16; see also Aplt. Addendum, Exhibit 1.
10/13/2005 Heavilin calls Ford.
10/17/2005 Heavilin calls Ford three times on the same day.
10/18/2005 Ford calls Heavilin and Heavilin calls him back. They decide to meet at the Rocky Flats Lounge. At the Lounge, Heavilin tells Ford the second machine gun he purchased had too much kick and he wanted a smaller caliber gun. He explains he has the money and would like the machine gun *980 in two weeks. Ford responds by saying he has not heard of anything being available, but something might come up around Christmas because someone might be in need of cash.
Unspecified time between 10/18/2005 and 10/28/2005 Second missing email: Heavilin emails Ford and asks him to locate and sell him a third machine gun.
10/28/2005 Third missing email: Ford sends the following reply to Heavilin’s email:
nothing at this time. I don’t expect to find a special on a computer this close to Christmas [sic]. Too much demand for a good sale. Just keep watching the newspaper ad’s [sic]. I am still watching.
R., Yol. I, Doc. 196, at 14.
11/17/2005 Heavilin calls Ford and asks him “what’s the word.” Aplt. Addendum, Exhibit 2. Ford replies that nothing is available. Heavilin tells Ford he knows someone in Colorado Springs but prefers to deal with only Ford. Ford suggests he ask the person in Colorado Springs. Heavilin tells Ford to keep in touch and let him know if anything becomes available.
11/19/2005 Ford calls Heavilin twice. Heavilin tells Ford that he will call him back. Twenty minutes later, Heavilin calls Ford, and Ford says a machine gun became available.
11/21/2005 Heavilin calls Ford and Ford calls him back. Heavilin meets Ford at a predetermined location and Ford gives him a decoy gun. Once Ford is sure that no police are monitoring the transaction, they meet again at a different location. Ford gives Heavilin the machine gun in exchange for $5,400 in cash.
After Ford and Heavilin completed the last transaction, law enforcement officers arrested Ford early the next day.
The jury’s verdict was split — acquitting Ford on the April 22 and August 2 transactions and convicting him based on the weapon sold or possessed on November 21, 2005.

Post-trial Proceedings

Ford subsequently filed a motion for a new trial, alleging the government violated Brady by withholding evidence material to his entrapment defense. In particular, he alleged the government withheld emails sent by Heavilin “that were exculpatory in that they would have provided documentary evidence to support [Ford’s] assertion that he was subject [to] government entrapment when he sold the third fully automatic weapon to [Heavilin].” R., Vol. I, Doc. 173 at 2, ¶ 2.
The government responded by stating it was not aware of any undisclosed emails. The district court agreed to hold an evi-dentiary hearing regarding the matter.
Prior to the hearing, Ford served a subpoena on Heavilin’s email provider, Yahoo, to determine whether any undisclosed emails could be recovered. Yahoo discovered a single email. This previously undisclosed email was sent by Ford to Heavi-lin on October 28, 2005. In the email, Ford tells Heavilin no “computer” was currently available for sale.[8]
*981 During the hearing, Heavilin explained that when he received an email from Ford, he forwarded it to Donald Estep. Estep was a Jefferson County deputy sheriff and he assisted the JTTF with the investigation. After Heavilin forwarded an email, he then deleted it from his Yahoo account.
With regards to the missing October 28 email, Heavilin explained Estep was out of the office when this email arrived; Estep was either on vacation or attending classes. Heavilin placed the email in the hold box of his Yahoo account. Presumably, he planned to forward the email to Estep when he returned to work. Heavi-lin testified he nonetheless forgot about the email and never forwarded it. He believed this email was the only message he forgot to send to Estep.[9]
In reviewing the evidence presented at the hearing, the district court nonetheless concluded two additional emails existed. The first email would have been sent by Heavilin sometime prior to October 5. In the email, the court concluded Heavilin asked Ford to sell him a third machine gun. The second email was sent sometime between October 18 and October 28, and likely spurred Ford’s October 28 response. In this email, the court concluded again that Heavilin asked Ford to sell him a third machine gun.
Even though the district court concluded the government withheld three emails, the court decided no Brady violation occurred. It concluded the undisclosed emails were merely cumulative to the substantial number of other contacts between Ford and Heavilin and would not have made a difference if presented at trial. The court therefore denied Ford’s motion for a new trial.
II. Discussion
The Due Process Clause of the Fifth Amendment requires the prosecution to disclose all evidence that favors the defendant and “is material either to guilt or to punishment.” United States v. Robinson, 39 F.3d 1115, 1118 (10th Cir.1994) (quoting Brady, 373 U.S. at 87, 83 S.Ct. 1194). This duty extends to investigators assisting the prosecution. See United States v. Velarde, 485 F.3d 553, 559 (10th Cir .2007).
Accordingly, a defendant may base a Brady claim on an investigator’s alleged failure to disclose material evidence, even when the prosecutor did not know of the evidence. Id. Because Ford is alleging a Brady violation, we review de novo the district court’s denial of his motion for a new trial. Id. at 558 (citing United States v. Pearl, 324 F.3d 1210, 1215 (10th Cir.2003)).
A defendant who seeks a new trial based on an alleged Brady violation must show by a preponderance of the evidence that “(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.” Id. at 558 (quoting United States v. Quintanilla, 193 F.3d 1139, 1149 & n. 10 (10th Cir.1999)). For the evidence to be material, there must be “a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.” Strickler v. Greene, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (internal quotation omitted). “The question is not whether the defendant would *982 more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.” Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).
In this case, we must decide whether the undisclosed evidence was material to Ford’s entrapment defense. The government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped. United States v. Nguyen, 413 F.3d 1170, 1178 (10th Cir.2005). The government entraps a defendant when (1) it induces the defendant to commit the offense, and (2) the defendant is not predisposed to commit the offense. Id.; see also Jury Instruction No. 22, Aplt. Reply Br., Attach. 1. Even though the government has the burden of proving the defendant was not entrapped, both “elements [are] required to find entrapment.” United States v. Young, 954 F.2d 614, 616 (10th Cir.1992). While “[t]he two elements of entrapment are closely related and often the same evidence and arguments will speak to both elements,” id., if the government disproves either element then the entrapment defense will fail.
Under the first element, the government induces the defendant when it engages in “conduct which creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense.” Nguyen, 413 F.3d at 1178. “Simple evidence that a government agent solicited, requested, or approached the defendant to engage in criminal conduct, standing alone, is insufficient to constitute inducement.” Id. (internal quotation marks omitted). Under the second element, predisposition exists if the defendant has an “inclination to engage in the illegal activity for which he has been charged, i.e., that he is ready and willing to commit the crime.” Id.
Even if a defendant was entrapped in one transaction, we do not automatically assume all subsequent transactions between the government agent and defendant are tainted. We have “explicitly refused to adopt as a general rule that once entrapment occurs, a defendant’s subsequent willing acts are immunized from culpability.” Id. at 1180 (internal quotation marks omitted).
Although the government did not produce three emails favorable to Ford’s entrapment defense, we agree with the district court that the evidence did not meet the materiality element required for a new trial.

A. The Government Failed to Disclose Favorable Evidence

To establish a Brady violation, the defendant must first show the government failed to disclose favorable evidence. The defendant does not have to establish bad faith.[10] United States v. Hernandez-Muniz, 170 F.3d 1007, 1010-11 (10th Cir.1999).

The Early October Email

The existence of the first missing email is based on a responsive email Ford sent on October 5, 2005. In this email, Ford stated the following:
Just returned from out of town. Social sounds good. I’ll call you and set something up over next couple of days. Not any good computer deals out there right now. I think rising costs are to blame. Just keep watching the big store ad’s [sic] for a sale.
*983 Should be able to call in the next couple of days.
R., Vol. I, Doc. 179 at 16. The district court concluded from this text that Ford was replying to an email previously sent by Heavilin asking if any more machine guns were available. The existence of the email is also reinforced by the transcript of an October 18, 2005 telephone conversation between Ford and Heavilin. In this conversation, Heavilin indicated he had earlier sent Ford an email message about purchasing a third machine gun. Heavilin told Ford, “And that’s kind of why I emailed and said give me a clue.” R., Vol. I, Doc. 196 at 9.
The district court also properly concluded the email supported Ford’s entrapment defense because it established an additional contact initiated by a government informant. This additional contact, therefore, supports Ford’s theory that the government’s persistence is the reason he committed the crime.

The Late October Emails

Ford obtained the undisclosed October 28 email from Heavilin’s Yahoo account. In the email, Ford told Heavilin:
nothing at this time. I don’t expect to find a special on a computer this close to Christmas [sic]. Too much demand for a good sale. Just keep watching the newspaper ad’s [sic]. I am still watching.
R., Vol. I, Doc. 196, at 14. Based on the text of this email, the district court convincingly concluded that an earlier email must have existed in which Heavilin asked Ford if any machine guns were currently available.
The district court also properly concluded both emails would have been favorable to Ford’s defense because they further supported his argument that Heavilin’s persistence was the reason Ford committed the crime.

B. The Undisclosed Emails Were Not Material

For the evidence to be material, there must be “a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.” Strickler, 527 U.S. at 289, 119 S.Ct. 1936 (1999) (internal quotation omitted). When reviewing materiality for Brady purposes, we are mindful of the Supreme Court’s admonition not to look for “ample, independent evidence of guilt” or “evidence sufficient to support the [jury’s] findings.” Strickler, 527 U.S. at 290, 119 S.Ct. 1936. Rather, we look to whether “the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.” Kyles, 514 U.S. at 435, 115 S.Ct. 1555. accord Strickler, 527 U.S. at 290, 119 S.Ct. 1936; Banks v. Reynolds, 54 F.3d 1508, 1518 (10th Cir.1995).
1.
In attempting to prove entrapment, the defendant’s central piece of evidence was an exhibit highlighting the number of times Heavilin contacted Ford. As the defense explained in closing,
This is the exhibit that you have seen, at least the first page, you have seen it a lot. But what you need to focus on for a minute is the sheer number of contacts initiated by Keith Heavilin.... That is call after call, meeting after meeting, for one purpose only; to make him think you are a friend, and to persuade or talk him into selling you an automatic weapon.
R., Vol. XV at 1832-33.
The exhibit showed over a hundred contacts between Ford and Heavilin during *984 the course of their dealings. From the first contact at the gun show to the first machine gun transaction, Heavilin initiated contact with Ford forty-three times, with a total of fifty-nine contacts. Between the first and second transaction, Heavilin initiated contact eighteen times, for a total of twenty-five communications.
Between the second and third sale, the exhibit identified twelve more contacts initiated by Heavilin, with a total of nineteen interactions. If the missing emails had been disclosed to the defense, the exhibit could have shown two additional contacts initiated by Heavilin, and one more by Ford.[11]
We agree with the district court there was not a reasonable probability that this additional evidence would have changed the outcome of the trial, especially in light of the strong evidence undermining Ford’s entrapment defense for the third sale. Based on a holistic review of the evidence, we are confident the jury would not have reached a different result if the government had satisfied its Brady obligations.[12]
Ford’s entrapment defense required the jury to determine if Ford was predisposed towards possessing or transferring the weapon in question. “The defendant’s lack of [] predisposition is the crux of the entrapment defense.” United States v. Fadel, 844 F.2d 1425, 1429 (10th Cir.1988). Predisposition is the “defendant’s inclination to engage in the illegal activity for which he has been charged.” United States v. Ortiz, 804 F.2d 1161, 1165 (10th Cir.1986). Predisposition may be ki ferred from the “defendant’s desme for profit, his eagerness to participate in the transaction, his ready response to the government’s ... offer, or his demonstrated knowledge or experience in the criminal activity under investigation.” United States v. Mendoza-Salgado, 964 F.2d 993, 1002-03 (10th Cir.1992) (internal quotation omitted).
For the following five reasons, we conclude the suppressed evidence does not cast sufficient doubt on the outcome to be material for Brady purposes. Evidence before the jury demonstrates Ford was predisposed toward possessing or transferring the fully automatic AR-15 machine gun. The suppressed evidence simply does not undermine the probability of the jury’s conclusion, and thus cannot be found material in this case.
First. The evidence suggests Ford was eager to sell Heavilin a third machine gun, despite diminished pressure from Heavilin. Heavilin told Ford on November 17 that a dealer in Colorado Springs might be willing to sell him a machine gun. Because Heavilin told Ford another dealer was available, the pressure on Ford to procure a third machine gun had been substantially reduced. But instead of acting relieved, Ford decided to complete the sale. Ford called Heavilin two days later and told him he found a third machine gun. Because Ford reinitiated contact with Heavilin after the November 17 discussion, when Ford was told Heavilin could buy the machine gun elsewhere, this phone call sug *985 gests Ford was ready and willing to engage in the illicit transaction.
Second. Ford insisted on completing the third transaction despite Heavilin repeatedly telling him he did not need to. When they met on October 18, 2005, and discussed another sale, Heavilin told Ford that he is “going to leave the decisions up to him.” R., Vol. X at 6. Heavilin explained at trial that he was referring to “whether [Ford] is able to do it safely without getting in trouble or any complications on his part.... If he doesn’t want to do it, get out of it.” Id. Later in the October 18 conversation, Heavilin also told Ford “if it isn’t safe, screw it.” Id.
And unlike the prior sales, when they met for the gun and money exchange on November 21, Ford initially gave Heavilin a decoy machine gun. When the sale did not result in the immediate appearance of law enforcement officers, Ford told Heavi-lin that the gun was actually a fake; he wanted to make sure police were not monitoring the transaction. Heavilin then told Ford he did not need to complete the transaction if he was worried. Ford insisted they go ahead and complete the sale, met Heavilin at a second location, and gave Heavilin the real gun. Ford’s careful planning and his insistence on finalizing the transaction supports the prosecution’s argument that Ford was predisposed toward committing the crime.
Third. The evidence shows for the first time Ford thought he would make a “decent” profit from selling a machine gun. As he testified, the third sale “was the first one I was actually going to make a decent profit on.” R., Vol. XIV at 37. Ford agreed to pay his dealer $5,000 for the gun and then charged Heavilin $5,400. This testimony about the third transaction suggests Ford was predisposed toward completing the last sale, even if he was induced to commit the previous two. See Mendoza-Salgado, 964 F.2d at 1002-03 (explaining that the defendant’s desire for profit from an illicit transaction supports an inference that he was predisposed to committing the crime).
Fourth. The nature of the contacts between the first two sales and the third sale is significant. By the time the third sale occurred, however, any previous entrapping influence exerted by the government had dissipated. In contrast to the first two sales where the jury found that Ford was entrapped, fewer contacts were made before the third sale where the jury did not find entrapment. And we agree with the district court that the substance of Ford’s October 5 email shows he was responding to Heavilin’s request for a gun, thus allowing Ford to convincingly argue the government initiated the idea of the third sale. The additional email contacts for the third sale would not have substantially changed the picture before the jury.
Fifth. The government produced evidence indicating Ford possessed the fully automatic AR-15, long before Heavilin asked to buy it. To prevail on the third sale and overcome Ford’s entrapment defense, the government only needed to prove Ford knowingly possessed or transferred this weapon. See 18 U.S.C. § 922(o); see also Jury Instruction No. 17 (“Defendant is charged in Count 3 of the Indictment with a violation of 18 U.S.C. § 922(o), which makes it a crime to knowingly transfer or knowingly possess a machine gun.”). If the fully automatic AR-15 had been part of Ford’s collection before Heavilin asked him to procure it, then the jury would be free to find that Ford could not have been entrapped; he already illegally possessed the weapon, regardless of the eventual transfer.
Ford’s co-worker Hee testified that in 2003 the two of them visited a cabin owned by Ford. Ford brought the fully automatic *986 AR-15 to the cabin, and they took turns shooting it at targets. Hee also testified that while he was visiting Ford’s house in May 2005, Ford again showed him the AR-15. Hee insisted the gun he shot in 2003 and saw in Ford’s residence in May 2005 was the same weapon Ford sold to Heavilin on November 21, 2005.[13]
In addition, two investigators who interviewed Ford after he was arrested also testified that Ford admitted he had possessed the AR-15 for an extended period of time, before selling it to Heavilin. Detective William Gallegos said Ford told him he had owned the weapon and had previously fired it. Similarly, FBI agent Brian Schmitt testified Ford had admitted that he had owned the weapon for a long time.
Rick Tarvin, an acquaintance of Ford, also testified that he had never sold Ford an AR-15 or any other machine gun. This evidence is significant because Ford claims Tarvin sold him part of the machine gun just a few days before he resold the weapon to Heavilin.
In its closing statement, the government repeatedly emphasized this evidence indicating Ford had illegally possessed the AR-15 long before Heavilin asked him to procure the weapon. To be sure, Ford’s counsel contested this testimony in the closing statement, arguing all of the government’s witnesses were not credible on this point.
In light of the strong evidence undermining Ford’s entrapment defense for the November 21 transaction, we conclude there is not a reasonable probability that the three undisclosed emails would have changed the outcome of the trial.
2.
Ford nonetheless makes three arguments supporting his claim that the case was a close one, and therefore any additional evidence of entrapment might have made a difference.
(1) Ford first points to the contents of the emails. He contends the emails are material to his entrapment defense because they show that (a) the idea for the third gun transaction came from Heavilin, (b) Ford was reluctant to sell Heavilin the gun, and (c) Heavilin repeatedly urged him to commit the crime. We disagree, and conclude the contents of the emails are not material.
First, Ford argues that the jury might have misinterpreted the October 5, 2005 email as suggesting the idea for the third sale originated from Ford. As the argument goes, the pre-October 5 email is material because it would have definitively shown the idea for the third sale came from Heavilin. But Ford never used the October 5 email to cross-examine Heavilin or to establish that he was responding to one of Heavilin’s earlier requests (by email or phone) for a gun. In this light, it is hard to place great weight on the exact wording of the email since the parties did not do so at trial. We thus agree with the district court that the content of this undisclosed email was not material to Ford’s *987 entrapment defense because the jury could only conclude that “Heavilin raised and discussed the subject of a third machine gun” and thus positioned Ford “to argue as he did at trial that the idea and impetus for a third machine gun was Heavilin’s.” Dist. Order at 14. And in any event, the origination of the idea for the third transaction is not dispositive of the overall predisposition question. Even assuming the government first approached Ford regarding a third sale, it could still rebut the entrapment defense by other evidence of predisposition. See generally United States v. Mendoza-Salgado, 964 F.2d 993, 1002-03 (10th Cir.1992).
Even so, the government did not repeatedly urge the jury to conclude that Ford originated the idea for the third weapon transaction in the October 5 email. For example, in its closing arguments, the government never suggested the idea for the third transaction originated with Ford rather than Heavilin.[14] Also, the absence of the pre-October 5 email did not prevent Ford from arguing that the idea for the third transaction originated with Heavilin, an argument he in fact did pursue, Dist. Order, at 11. Thus, we agree with the district court that while the government may have “contended that there was no entrapment [ ] because the idea and impetus for the third illegal weapon came from defendant,” Dist. Order at 3, we also agree with the district court that the pre-October 5 email “is not material, but instead, is largely cumulative.” Id. at 14.[15]
Furthermore, the jury also heard of evidence after the October 5 communication indicating the idea for the last transaction was raised by Heavilin. The jury heard the audio of an October 18, 2005 conversation, in which Heavilin tells Ford he would like to purchase a third machine gun.[16] In cross-examination, Heavilin admitted he initiated the discussion of the weapon in the October 18 meeting. Defense counsel asked Heavilin, “And you tell [Ford] at that point about your desire to have a third weapon and how you got the money ready this time, right?” Heavilin responded, “Yes, sir.” R., Vol. X at 74.[17] In sum, the email is not material and does not undermine our confidence in the jury’s conclusion that Ford was predisposed to commit the crime.
*988 We also reject Ford’s argument that the undisclosed October 28 email provided material evidence showing he was reluctant to sell Heavilin the third machine gun. In the email, Ford tells Heavilin that no weapons were currently available. Ford’s claims about the importance of this evidence are not persuasive because the content of the email was largely cumulative. At trial, Ford was able to present unrebut-ted evidence showing that on October 18 and November 17 he told Heavilin that no machine guns were currently available.
A close look at the October 28 email, furthermore, shows only weak support for Ford’s claim that he was reluctant to procure the weapon. In the email, Ford said he was currently unable to procure the machine gun. He did not state or suggest he was unwilling. In fact, Ford tells Heavilin that he is “still watching” for an available weapon. R., Vol. I, Doc. 196 at 14. At best, the email cuts both ways for Ford.
Finally, we reject the contention that the emails provided material evidence showing Heavilin repeatedly pressured him to commit the crime. Out of the twelve communications initiated by Heavi-lin leading up to the last transaction, two more emails do not add up to much more. Moreover, nothing in the record suggests Heavilin had more aggressively asked Ford about the machine guns in the pre-October 5 and pre-October 28 emails compared to the communications before the jury.[18]
In sum, we conclude the contents of the undisclosed emails were not sufficiently material to cast doubt on the jury’s verdict.[19]
(2) Second, Ford emphasizes that the jury acquitted him of the first two sales, suggesting the evidence supporting his conviction on the third count was weak. But as we have already explained, substantially different circumstances existed between the November 21 sale and the prior two sales. Acquittal on the first two counts, therefore, does not imply that the evidence supporting the third count was weak. See Nguyen, 413 F.3d at 1181.
(3) Finally, Ford suggests the case was close based on the fact that the jury took a day and half to deliberate, asked the judge certain questions about the evidence, and asked to see certain trial exhibits corroborating Ford’s testimony. But this fact does nothing to show which counts, if any, concerned the jury. We can only speculate whether the jury had any concerns in *989 particular about the quality of the evidence for the third count.
In sum, in light of the strong evidence that Ford was predisposed to possessing the third machine gun and selling it to Heavilin, we conclude the three non-disclosed emails were not material to Ford’s defense.
III. Conclusion
Because Ford failed to establish a Brady violation, the district court did not err in denying Ford’s motion for a new trial. Therefore, we AFFIRM the district court’s denial of Ford’s request for a new trial.

. The JTTF is a law enforcement task force comprised of the FBI and other federal, state, and local law enforcement agencies that investigate crimes involving international and domestic terrorism.

. In the record, the parties and witnesses also refer to this weapon as an Olympic Arms machine gun.

. He was also indicted on one count of knowingly possessing a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k). This charge is not relevant to the present appeal; the jury acquitted him on this count.

. For the dates August 14, October 5, October 13, and October 17, the only information available to the jury was the existence of the contacts. The trial record does not contain information regarding what was said or written.

. Additionally, a recording of the conversation was played at trial.

. Both Ford and the government state the text of this email was available to the jury, but do not cite to the trial record to show where it was discussed or admitted. Instead the parties merely cite an exhibit Ford submitted with his motion for a new trial. See R., Vol. I, 179 at 16.

. Computer was Ford and Heavilin’s code word for machine gun.

. See supra note 7.

. The government agreed at oral argument that entrusting evidence preservation to an informant is improper procedure. That error was compounded in this case by the failure to make timely access to the computer hard drives the government held after it arrested Ford.

. On this record, no one points to bad faith by the government.

. We note the jury could have concluded the existence of the early October email because Heavilin mentioned it in the October 18 conversation, which the jury heard a recording of. See supra Part II .A.

. Although the dissent contends we shortchanged some of the evidence offered by the defense, we have conducted a review of the entire record, considered all of the evidence— including every portion of the record highlighted by the dissent — not in isolation but as a whole. We focus on the cited evidence in large part because this evidence supports our confidence that the jury's verdict is worthy of confidence.

. The dissent highlights liow Hee testified that in May 2005 he saw both the third machine gun and the second machine gun, and thus the jury "was plainly free not to [convict]” for the second transaction on account of this evidence, and thus the dissent reasons, the "materially identical” evidence as to the third transaction also would not support entrapment. Dissent at 1001 n. 9. However, the evidence supporting possession for the third machine gun was not materially identical, as Hee's testimony showed he had both longer and more significant contact with the third machine gun. Hee not only saw Ford possess the third gun two years prior to the transaction, he also fired the third gun in full automatic mode.

. The government made a brief reference in opening statement which may have suggested that Ford initiated the idea for the third sale. R., Vol. VIII at 170. That fleeting suggestion was not raised in closing argument, and we see no other clear reference to the government pursuing the argument during trial, let alone a repeated suggestion.

. To clarify, highlighting the government's lack of emphasis at trial on Ford initiating the third transaction, does not impugn the district court's findings. Dissent at 997 n. 4. We are in agreement: the government did argue (albeit briefly) that Ford initiated the transaction, Ford repeatedly claimed Heavilin initiated the transaction, and thus the pre-October 5 email would have been favorable, but not material. We, like the district court, "cannot say that the admission of Heavilin's missing email might have affected the outcome of the trial.” Dist. Order at 14.

. In this conversation, Heavilin also briefly references an email he previously sent to Ford asking if a third machine gun was available, so the jury would have been aware of prior email traffic. See R., Vol. I, Doc. 196 at 9. This evidence further suggests the idea for the transfer originated with Heavilin.

. In light of this cross-examination, the dissent's citation of Heavilin's direct examination about the October 18 conversation as evidence that the government "repeatedly argued that the evidence proved Mr. Ford instigated the discussions about a third gun sale,” Dissent at 993, is overly generous. The October 18 discussion did not show, and was not argued to show, that Ford initiated the third sale.

. In fact, the content of Ford and Heavilin’s emails were not a big selling point at trial. Not all of the emails are contained in the record on appeal, and the ones that are supplied are relatively benign: they show that Heavilin and Ford used the email traffic primarily to keep communications open and to set the stage for subsequent phone calls and meetings where the parties conducted their business.

. Ford also argues the government used the undisclosed emails against him by suggesting he was lying about the existence of additional emails. In support of this argument, Ford cites the following passage from the government's rebuttal closing argument:
And what you understand as the jury, I am sure, is that the defense has access to the same information that the government does, and despite the defendant’s counsel telling you that the defendant was not willing to possess and sell machine guns, where is it? Where does he say that?
R„ Vol. XV at 194.
In this passage, however, the prosecutor was not referring to emails or any other specific evidence. Instead, the prosecutor was merely arguing that the overall record indicates Ford was predisposed toward possessing and selling machine guns. As explained above, the presence of two more emails from Heavilin would not have materially undermined the strength of the government’s case.