FILED
United States Court of Appeals
Tenth Circuit

November 14, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff–Appellee,

    v.

BRAD AHRENSFIELD,

    Defendant–Appellant.

No. 11-2198

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. 09-CR-3457)**

---

Jason Bowles (B.J. Crow and Monica L. Garcia with him on the brief), of Bowles and Crow, Albuquerque, New Mexico, for Defendant–Appellant.

Gregory J. Fouratt, Assistant United States Attorney (Kenneth J. Gonzales, United States Attorney, and Tara C. Neda, Assistant United States Attorney, with him on the brief), Albuquerque, New Mexico, for Plaintiff–Appellee.

---

Before **BRISCOE**, Chief Judge, **McKAY** and **GORSUCH**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Following a jury trial, Defendant was convicted of obstructing justice in violation of 18 U.S.C. § 1512(c)(2). He was sentenced to a term of imprisonment of six months and one day, followed by six months of home confinement and a

term of supervised release.  This appeal followed.

## BACKGROUND

Defendant's conviction stems from his disclosure of the existence of an ongoing undercover investigation to one of the targets of that investigation.  In September 2009, Operation Safe Streets, a task force funded by the Federal Bureau of Investigation, acting in connection with the Albuquerque Police Department (APD), was investigating possible criminal activity at the Albuquerque business Car Shop.  The investigation was focused specifically on alleged drug dealing and trafficking of stolen property by Car Shop employees and the role, if any, of Car Shop's owner, Shawn Bryan.  At the time, Car Shop had a contract with the APD under which it provided and serviced undercover cars for the department.

The investigation began after a sergeant with the APD who was then assigned to the task force received a tip from a confidential informant that illegal activity was taking place at Car Shop.  The confidential informant, who had been arrested for residential burglary while using a vehicle registered to Car Shop, provided the following information:  he would use Car Shop vehicles to commit burglaries and store the stolen merchandise; Car Shop employees would purchase his stolen merchandise; a Car Shop mechanic dealt marijuana and cocaine; and Mr. Bryan was the leader of these criminal activities.  This caused the sergeant particular concern because of Car Shop's relationship with the APD.  As a result,

the task force, which included members of the APD and FBI, initiated the undercover investigation of Car Shop and Mr. Bryan. Although Defendant was, at that time, an APD officer, he was not a part of the task force and was not aware of or involved in the investigation.

As part of the investigation, the task force used the confidential informant to make controlled drug purchases from the mechanic. The purpose of these purchases was two-fold. First, they were designed to verify the information provided by the confidential informant. Second, assuming the information was true, the task force intended to arrest the mechanic and attempt to "roll" him to obtain information about Mr. Bryan's alleged criminal activity. The task force anticipated presenting the confidential informant's testimony to a federal grand jury in order to obtain an indictment against the mechanic as an incentive for him to work as an informant. In addition to the controlled purchases, the task force intended to investigate Mr. Bryan's finances. It had sent requests for financial information to various institutions and received responses characterizing Mr. Bryan's accounts as suspicious. The task force planned to use federal grand jury subpoenas to obtain further information on Mr. Bryan's bank accounts.

On September 18 and 21, 2009, members of the task force monitored the confidential informant as he made controlled purchases of marijuana from the mechanic. Task force members then arranged for the confidential informant to make a controlled purchase of crack cocaine on the afternoon of the 21st. Prior to

this purchase, the task force sought surveillance assistance from undercover detectives with APD's Special Investigations Division (SID), including Officer Ron Olivas. During that surveillance, Officer Olivas learned that Defendant's teenage son was working at Car Shop. This was noteworthy to Officer Olivas because he was friends with Defendant. However, he and the other task force members were specifically instructed not to tell Defendant about the investigation because it was considered to be a need-to-know investigation. After monitoring the third controlled purchase, the detectives were debriefed and given details of the investigation.

Later that evening, Officer Olivas met with Defendant because he felt Defendant's son would potentially be in danger if he continued to work at Car Shop. Despite having been instructed not to inform Defendant of the investigation, Officer Olivas did just that. He provided Defendant with the details of the investigation he had learned, including that Car Shop was being investigated for drug dealing and trafficking of stolen property, a confidential informant was making controlled purchases of drugs from the mechanic, "that potentially the owner of The Car Shop [sic] was going to be a criminal target of the investigation" (Supplemental App. at 1039), there was a potential financial investigation of Mr. Bryan, and the FBI and SID were involved in the investigation. After sharing this information, Officer Olivas and Defendant discussed ways to ensure Defendant's son no longer worked for Car Shop without

raising Mr. Bryan's suspicions. Ultimately, they decided Defendant would tell Mr. Bryan his son needed to focus on his schoolwork and athletics.

The following afternoon, September 22, Defendant called Mr. Bryan to advise him that his son could no longer work at Car Shop. In accordance with the plan Defendant and Officer Olivas discussed the night before, Defendant told Mr. Bryan his son needed to focus on his responsibilities at school. Mr. Bryan understood and did not find this to be suspicious. Later that night, Defendant called Mr. Bryan a second time. This time, however, Defendant called Mr. Bryan from a payphone. He asked Mr. Bryan to meet him on the street outside of Mr. Bryan's gated community and told him to walk east along the street and to wear a baseball cap. Rather than driving his own car, Defendant drove his girlfriend's car, which was not registered to him.[1] Defendant met Mr. Bryan on the street, picked him up, and drove around the area.

Once Mr. Bryan was in the car, Defendant proceeded to tell him about the undercover investigation of Car Shop. There is some disagreement as to precisely what Defendant told Mr. Bryan. The jury did, however, hear testimony that Defendant shared certain details of the investigation. He informed Mr. Bryan the

---

[1] During the trial, Defendant testified that he called from a payphone because he had accidentally left his cell phone at home, that he asked Mr. Bryan to meet him on the street because he did not want to have to go through the gate to the community, that he asked Mr. Bryan to put on a hat because it was cold outside, and that he drove his girlfriend's car because it was parked behind his in the driveway.

APD and FBI were conducting an undercover operation at Car Shop, Mr. Bryan was suspected of being the "sergeant major," or leader, of a criminal organization (Supplemental App. at 950), a Car Shop mechanic was dealing drugs and was "going away" (*id.* at 1178), and Mr. Bryan "was being looked into" (*id.* at 946). Later that night, after hearing this information, Mr. Bryan contacted the then-Bernalillo County Sheriff to inquire about why he was under investigation.

The next morning, Mr. Bryan met with the then-commander of the APD and asked him about the undercover investigation. During the meeting, it became clear to the commander that Mr. Bryan was aware of a number of details of the investigation. Mr. Bryan informed the commander he had learned about the investigation from Defendant. Later that morning, the commander and Mr. Bryan met with a lieutenant from the APD. Mr. Bryan again disclosed a number of details about the covert operation. Mr. Bryan then returned to Car Shop and met individually with each of his employees, including the mechanic. He questioned them about whether "they had done something wrong . . . something that would compromise [Mr. Bryan's] business, [his] family." (*Id.* at 966.)

Because of Mr. Bryan's awareness of the ongoing investigation, the task force decided it was necessary to shut down the investigation. As a result, the confidential informant was unable to make the final planned controlled drug purchase. The task force was, however, still able to arrest and interrogate the mechanic. Ultimately, the mechanic did not provide any information that

-6-

implicated Mr. Bryan in criminal activity. The task force decided not to use a federal grand jury to obtain an indictment against the mechanic or to issue subpoenas for Mr. Bryan's financial information, as had been planned. The task force felt doing so would have "been fruitless" because Mr. Bryan was already aware of what was intended to be an undercover, covert investigation. (*Id.* at 823.)

Once the task force learned Mr. Bryan was aware of the investigation, two FBI agents were assigned to investigate the circumstances surrounding the compromise. By this point, Officer Olivas had learned SID had been removed from the investigation, although he did not know why. He spoke with Defendant to confirm Defendant had not raised Mr. Bryan's suspicions by having his son stop working at Car Shop. Defendant assured Officer Olivas this was the case—all had gone according to plan.

Late in the evening on September 23, the FBI agents went to Defendant's home to interview him about the allegation that he had informed Mr. Bryan of the undercover investigation of Car Shop. Defendant denied knowing about the Car Shop investigation, denied speaking with any SID detectives about the investigation, and denied discussing the investigation with Mr. Bryan. That same evening, Mr. Bryan called Defendant using his neighbor's phone, and the two had a conversation "in code." (*Id.* at 1026.) Defendant later called the neighbor and asked her to relay a coded message to Mr. Bryan.

In the early hours the following morning, September 24, Defendant sent a text message to a former APD officer and friend stating he needed help. He asked the officer to contact Officer Olivas via Officer Olivas's wife's cell phone. The officer was uncomfortable doing this, and instead contacted Officer Olivas directly. Officer Olivas told the officer Defendant could call him directly, which the officer passed on to Defendant. When Defendant finally spoke with Officer Olivas, he told Officer Olivas that members of the APD and FBI had been at his house the night before to talk with him about the Car Shop investigation. He said the FBI had asked about the investigation and he had responded that he had no knowledge of the investigation and that no one from SID, including Officer Olivas, had told Defendant about the investigation. Defendant also assured Officer Olivas he had not told Mr. Bryan about the investigation.

Defendant was ultimately arrested and charged with one count of obstruction of justice and one count of making false statements to the FBI agents who investigated the compromise of the investigation. The obstruction of justice charge was based on Defendant's obstruction or attempted obstruction of the anticipated federal grand jury proceedings that would have been used in connection with the undercover investigation of Car Shop and Mr. Bryan. The case first went to trial in April 2010. At the conclusion of that trial, the jury found Defendant not guilty of making false statements but was unable to reach a verdict on the obstruction of justice charge. As a result, the trial was ultimately

reset for December 13, 2010, on the remaining obstruction of justice charge.

Before the second trial began, Defendant filed a motion to exclude testimony and evidence regarding the false statements he allegedly made to the FBI agents. He argued the Double Jeopardy Clause precluded the government from introducing any evidence regarding the false statements because he had been acquitted of that charge by the jury in the first trial. In a memorandum opinion and order, the district court denied Defendant's motion. Evidence regarding the false statements was introduced during the second trial through the testimony of one of the interviewing FBI agents, Officer Olivas, and Defendant.

During direct examination of Mr. Bryan at the second trial, the government impeached Mr. Bryan's testimony by reading from a transcript of an interview the FBI had conducted with Mr. Bryan after Defendant's first trial. During this interview, the FBI asked Mr. Bryan about his conversation with Defendant on September 22 and what Defendant had told him about the investigation. Mr. Bryan claimed Defendant only told him about a rumor and that the APD commander was the one to provide the details of the investigation during their meetings on September 23. He also claimed he received several details from the sheriff, whose wife[2] had text-messaged the information to his wife.

Counsel for Defendant advised the district court he had not been provided a

---

[2] At the time the text messages were sent, the sheriff and his girlfriend were not yet married.

copy of the transcript or a recording of the interview, and he was unaware the FBI had interviewed Mr. Bryan following the first trial.[3]  At that point, the government provided Defendant with a copy of the transcript of Mr. Bryan's interview.  Defense counsel read through the transcript during the lunch hour and

---

[3] However, in a May 5, 2010, email later discovered by the government, defense counsel informed the government:

> I received some information that I have not verified that Darren White [(the then-Sheriff of Bernalillo County)] through his girlfriend may have passed information regarding the investigation onto [sic] Shawn Bryan.  I understand that [FBI] Agents McCandless and Washington may have been informed of this.  I stress that I have not verified any of that and I do not know if it is true or not but wanted to see if the FBI was looking into the matter.  I understand that there may be numerous text messages between [Mr. Bryan's wife] and Darren White's girlfriend or fiancée.  Will you let me know if you are aware of this matter and whether the FBI is looking into it?  I am not suggesting in the slightest that Darren did anything wrong, I just believe if it happened it could tend to exculpate Brad.

(Supplemental App. at 102.)

> The government responded:
> Bryan apparently fired [his lawyer] and came into FBI for an interview (I just got cd and have a copy for you, as well).  During the interview, Bryan made a number of strange allegations (as he is prone to do) [sic] it was taped and I will disclose.  For example, he claimed APD burglarized his home - though, he claimed to the APD that the FBI did so.  He also mentioned that Darren and his girlfriend talked to [sic] about the investigation - but, he claimed this happened well after Sept. 22.  The fbi [sic] did interview Darren after Bryan's visit to the FBI, but he said he has had no such conversation with Bryan.  Bryan and Darren state that Darren was unaware of investigation before Bryan told Darren on Sept. 22. This is corroborated by APD.

(Supplemental App. at 102.)

The government brought these emails to the district court's attention after the district court had issued its memorandum opinion and order denying Defendant's motion to dismiss for *Brady* violations.  During oral argument, defense counsel represented that he had forgotten about the email exchange.

-10-

informed the district court there was a significant amount of what he believed to be *Brady* material in the transcript. As a result, he requested additional time to highlight relevant portions of the transcript that could be used during the cross-examination of Mr. Bryan. He also made an oral motion to dismiss the case due to the government's alleged *Brady* violation. The district court allowed counsel to take a break to review the transcript, and the trial continued later that afternoon. Defendant then engaged in extensive cross-examination of Mr. Bryan using the transcript.

The following morning, Defendant filed his motion to dismiss, arguing the case should be dismissed as a result of the alleged *Brady* violation. That same morning, the government produced—for the first time—a transcript of a phone call between Mr. Bryan and the FBI agents that took place prior to the interview. After reviewing the transcript, Defendant again moved to dismiss. He requested that, in the alternative, the district court strike the testimony of the FBI agent, which had been given at the end of the day before. The district court instead allowed Defendant to recall the FBI agent for further cross-examination as part of the government's case. Defendant did so and effectively cross-examined the FBI agent using the transcript.

At the close of the government's case, Defendant made a Rule 29 motion for judgment of acquittal. He renewed this motion at the conclusion of the trial. The district court deferred ruling on the motion. After deliberating for

approximately seven to eight hours and receiving a modified *Allen* charge, the jury returned a guilty verdict.

Shortly after the conclusion of the trial, Defendant discovered he had not received a copy of a laboratory report disclosing the results of a chemical analysis of the drugs purchased by the confidential informant from the Car Shop mechanic. In an email discussing the report, the government informed defense counsel that the substance tested positive for cocaine, but had not been tested to determine whether it was crack cocaine. The government had yet to produce a copy of the report. Defendant argued this was a further *Brady* violation requiring dismissal.

After holding an evidentiary hearing on the alleged *Brady* violations and reviewing briefs from both parties, the district court issued a memorandum opinion and order denying Defendant's motions to dismiss. The district court held that although the evidence had been suppressed, it was not material and there was, therefore, no *Brady* violation. The district court then issued a memorandum opinion and order denying Defendant's motion for judgment of acquittal. Defendant was sentenced to a term of imprisonment of six months and one day, followed by six months of home confinement and a period of supervised release. Defendant now appeals.

## DISCUSSION

Defendant raises three issues on appeal. First, he argues the district court erred in denying his motion for a new trial based on alleged *Brady* violations.

Second, he argues the district court erred by allowing the government to introduce evidence that he allegedly made false statements to the FBI because he had been acquitted of that charge in the first trial. Finally, Defendant argues the district court erred in denying his motion for judgment of acquittal.

## I. *Brady* Violation

Defendant argues the district court erred in concluding there was no *Brady* violation. He argues the government violated *Brady* by failing to disclose the transcript of the FBI interview of Mr. Bryan until the second day of trial, failing to disclose the transcript of the phone call between Mr. Bryan and the FBI until the morning of the third day of trial, failing to disclose the corresponding recordings until after trial, and failing entirely to disclose the laboratory report containing results of a chemical analysis of the drugs purchased by the confidential informant.

We review the district court's decision to deny a motion for a new trial based on a *Brady* violation de novo. *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008). "A defendant who seeks a new trial based on an alleged *Brady* violation must show by a preponderance of the evidence that '(1) the prosecution suppressed evidence, (2) the evidence was favorable to the defendant, and (3) the evidence was material.'" *Id.* (quoting *United States v. Velarde*, 485 F.3d 553, 558 (10th Cir. 2007)). The government does not dispute that the evidence was suppressed. It also does not dispute that the transcripts and recordings were

favorable to Defendant. The questions before us then are whether the suppressed evidence was material and whether the laboratory report was favorable.

"[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In making this determination, we evaluate the withheld evidence "in light of the entire record in order to determine if the omitted evidence creates a reasonable doubt that did not otherwise exist." *Banks v. Reynolds*, 54 F.3d 1508, 1518 (10th Cir. 1995) (internal quotation marks omitted). We do not, however, resort to speculation. *Id.* at 1519. "'The mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard.'" *Id.* (quoting *United States v. Fleming*, 19 F.3d 1325, 1331 (10th Cir. 1994)).

Defendant first claims the government violated *Brady* by failing to disclose transcripts of the FBI interview of Mr. Bryan and the preceding phone call between Mr. Bryan and the FBI until during trial, and by failing to disclose the corresponding recordings until after trial. Because the transcripts were produced during trial, our materiality inquiry focuses on "whether there is a reasonable probability that the outcome of [the trial] would have been different had the

[government] disclosed th[e] information earlier."[4] *Knighton v. Mullin*, 293 F.3d 1165, 1172-73 (10th Cir. 2002).  Defendant identifies three ways in which he would have used the transcripts and recordings had they been provided earlier: (1) he would have prepared extensive cross-examination of Mr. Bryan and the FBI agent, which would have included playing clips from the recordings; (2) after learning of Mr. Bryan's statement regarding the text messages between Mr. Bryan's wife and the sheriff's wife, he would have issued a subpoena for the cell phones to obtain the text message information and issued a subpoena for the trial testimony of Ms. Bryan and the sheriff's wife; and (3) he would have been fully prepared to use portions of the transcript during the testimony of the APD commander and the sheriff to show they, not Defendant, provided Mr. Bryan with the details of the investigation.[5]  He argues each of these proposed uses establishes the evidence was material.  We disagree.  Defendant has failed to

---

[4] Although the recordings were not produced during trial, this does not affect our analysis.  As discussed below, we conclude there would have been no added benefit to having the recordings in addition to the transcripts.

[5] Defendant additionally argues the late disclosure of the transcripts prevented him from "incorporat[ing] them into the defense strategy." (Appellant's Corrected Reply Br. at 9.)  During oral argument, counsel for Defendant expounded on this argument, explaining that he would have incorporated the suppressed evidence into his opening statement.  However, without greater detail, we are unable to evaluate whether there is a reasonable probability that, had Defendant incorporated the suppressed evidence into his opening statement, the outcome of the trial would have been different.  This is particularly so given the problems underlying Defendant's proposed uses of the evidence during trial, which are discussed below.

demonstrate that, had he had the opportunity to employ these tactics, there is a reasonable probability the outcome of the trial would have been different.

First, he offers no explanation as to how his cross-examination of Mr. Bryan or the FBI agent would have been different had the government disclosed the transcripts earlier. Defendant conducted extensive and effective cross-examination of Mr. Bryan after the district court provided him additional time to review and highlight the interview transcript. Similarly, after Defendant received the transcript of the telephone call, the district court allowed him to recall the FBI agent for further cross-examination. This took place during the government's case-in-chief and first thing in the morning following the FBI agent's testimony the day before. And we are not persuaded by Defendant's argument that it would have been more effective to use the recordings for impeachment. Defendant was able to impeach Mr. Bryan and the FBI agent by reading directly from the transcripts, as was done with other witnesses throughout trial.

Second, Defendant offers only the mere possibility that, had he subpoenaed the phones and testimony of Ms. Bryan and the sheriff's wife, the text messages and testimony would have shown that Mr. Bryan learned details of the investigation from people other than Defendant. This assertion fails—for several reasons—to establish the suppressed evidence was material. As an initial matter, we have nothing from which we can conclude what the evidence might have shown. Defendant has not demonstrated the text messages would have been

available[6] or what the witnesses' testimony would have been.  *See Leyja v. Parker*, 404 F. App'x 291, 296 (10th Cir. 2010) (rejecting the defendant's *Brady* claim because the defendant had not shown how the suppressed evidence would have been used as impeachment to further his defense); *Sandoval v. Ulibarri*, 548 F.3d 902, 915 (10th Cir. 2008) (concluding the defendant had failed to establish a *Brady* violation because he had not shown that, had the suppressed evidence been produced, "admissible evidence could have been adduced that would have supported his [defense]").  Even assuming the text messages and testimony would support Defendant's argument that a significant number of details came from sources other than Defendant, the jury heard similar testimony from Mr. Bryan. He repeatedly testified that Defendant provided only vague information about a rumor and that the details came from the APD commander.  Our confidence in the verdict is not undermined because the jury already considered, and rejected, the assertion that Defendant did not have the intent to obstruct justice because he did not provide *all* of the details of the investigation to Mr. Bryan.  Finally, we note

---

[6] The only evidence in the record is to the contrary.  During the FBI interview, Mr. Bryan informed the agents that his wife no longer had the text messages.  And the government provided interview reports from one of the FBI agents who had contacted the phone providers establishing that the messages would have been purged by the phone providers before Mr. Bryan's interview took place:  the Verizon Wireless representative informed the agent that text message content is held by the company for only three to five days; the T-Mobile representative informed the agent that the company does not store text message data absent a court order in effect at the time the messages were sent.

that more than six months before trial, Defendant was aware of Mr. Bryan's assertion he had learned details of the investigation from the sheriff through text messages between their wives. Defense counsel informed the government of this very fact in an email sent on May 5, 2010, further demonstrating the evidence was not material. *See United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009) ("[A] defendant is not denied due process by the government's nondisclosure of evidence if the defendant knew of the evidence anyway."); *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999) ("[A] defendant's independent awareness of the exculpatory evidence is critical in determining whether a *Brady* violation has occurred. If a defendant already has a particular piece of evidence, the prosecution's disclosure of that evidence is considered cumulative, rendering the suppressed evidence immaterial.").

Third, and finally, Defendant is unable to explain how having the transcript earlier would have affected his ability to question the APD commander and the sheriff about whether they, and not Defendant, were the ones to provide the details of the investigation to Mr. Bryan. Although Defendant did not have the interview transcript at the time he cross-examined the APD commander, he had learned from Mr. Bryan's testimony during the first trial, which was similar to his answers during the FBI interview, that Mr. Bryan claimed the commander provided him with some of the details of the investigation on September 23, *after* he had met with Defendant. Because the information contained in the transcript

-18-

duplicated information Defendant already had, it was not material. *See Erickson*, 561 F.3d at 1163; *Quintanilla*, 193 F.3d at 1149. And, with respect to the sheriff, the government did not call him as a witness during trial, so there was no opportunity for Defendant to cross-examine him. Furthermore, despite the fact Defendant had subpoenaed the sheriff and received and reviewed the transcript, he deliberately chose not to call the sheriff to testify. Defendant now argues doing so would have been ineffective unless he was also able to call Ms. Bryan and the sheriff's wife and to impeach the sheriff with the text messages. But, as previously discussed, there is nothing from which we can conclude the sheriff's testimony would have been effectively impeached. Nor is there anything from which we can conclude the sheriff's testimony would have supported Defendant's theory. To the contrary, an FBI interview report from an interview with the sheriff indicates he adamantly denied Mr. Bryan's assertions. For each of these reasons, Defendant has failed to show a *Brady* violation based on the delayed production of the transcripts and the suppression of the recordings.

Defendant's second *Brady* claim is based on the government's complete suppression of the laboratory report indicating the drug purchased from the mechanic tested positive only for cocaine not crack cocaine. Defendant argues the report was favorable and material because it could have created reasonable doubt that it was foreseeable the investigation would lead to a federal grand jury proceeding, since a higher quantity of cocaine is required to trigger a federal

prosecution. However, contrary to Defendant's argument, the report does not establish the drug *was not* crack cocaine, but rather only that confirmatory testing to determine whether the cocaine also consisted of cocaine base was not done. Evidence the drug purchased *was* crack cocaine came from the testimony of the APD sergeant. He testified the substance appeared to his trained eye to be crack, the substance was packaged in a manner consistent with crack, crack is what the confidential informant had bargained for, and the undercover recording of the controlled purchase included a discussion of "rocking it up" and making it "a little harder" next time. (Supplemental App. at 796.) When cross-examined by Defendant, the sergeant admitted the drug tested positive for cocaine and not necessarily crack cocaine. But he emphasized the drug was nevertheless "consistent with" crack cocaine. (*Id.* at 795.) Even if the report tended to show the drug was not crack cocaine, our confidence in the jury verdict is not undermined. An FBI agent with the Operation Safe Streets task force testified that the decision whether to prosecute drug offenses through that program was made on a case-by-case basis and was not strictly dependent on the quantity of the drug. And the likely success of an underlying proceeding against the mechanic or Mr. Bryan was not at issue; the jury need only have found one was foreseeable to Defendant. For these reasons, we conclude that the laboratory report showing the substance was only tested to determine if it contained cocaine was neither favorable nor material. There was, therefore, no *Brady* violation.

For the foregoing reasons, we affirm the district court's denial of Defendant's motion for a new trial based on alleged *Brady* violations. Because we conclude there was no *Brady* violation, we need not address Defendant's argument that any such violation was intentional.

## II. Double Jeopardy

We review the district court's ultimate determination regarding double jeopardy de novo. *United States v. Rodriguez-Aguirre*, 73 F.3d 1023, 1025 (10th Cir. 1996). The Double Jeopardy Clause "embodies two vitally important interests." *Yeager v. United States*, 557 U.S. 110, 117 (2009). The first is the principle that the state is not permitted to make repeated attempts to convict an individual for the same offense. *Id.* at 117-18. "The second interest is the preservation of the finality of judgments." *Id.* at 118 (internal quotation marks omitted). Defendant argues the second principle precluded the government from introducing evidence he allegedly made false statements to the FBI because he had been acquitted of that charge in the first trial.

The second principle, referred to as the collateral-estoppel component of the Double Jeopardy Clause, "precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." *Id.* at 119. This is because "when an issue of ultimate fact has once been determined by a valid and final judgment" of acquittal, "that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436,

443 (1970).  However, the Supreme Court has expressly "decline[d] to extend *Ashe v. Swenson* and the collateral-estoppel component of the Double Jeopardy Clause to exclude in all circumstances . . . relevant and probative evidence that is otherwise admissible under the Rules of Evidence simply because it relates to the alleged criminal conduct for which a defendant has been acquitted."  *Dowling v. United States*, 493 U.S. 342, 348 (1990).  Where the government is not required to prove the offered evidence relating to the prior acquittal beyond a reasonable doubt, "the collateral-estoppel component of the Double Jeopardy Clause is inapposite."  *Id.* at 348-49.

Here, the crime of obstruction of justice does not share any of the same elements with the crime of making false statements, of which Defendant was acquitted.  The government introduced evidence that Defendant lied to the FBI as "proof of the defendant's guilty knowledge"  (App. at 51), not because it was a required element of the offense of obstruction of justice.  The government, therefore, was not required to prove beyond a reasonable doubt that Defendant lied to the FBI.  *See Rossetti v. Curran*, 80 F.3d 1, 5 (1st Cir. 1996) ("No intermediate fact need be proved beyond a reasonable doubt, so long as the crime itself is proved beyond a reasonable doubt.").  As explained by the Supreme Court in *Dowling*, the "jury might reasonably conclude that [Defendant lied to the FBI], even if it did not believe beyond a reasonable doubt that [Defendant] committed the crime[] charged at the first trial."  *Dowling*, 493 U.S. at 348-49.  Accordingly,

-22-

the district court correctly concluded that the collateral-estoppel component of the Double Jeopardy Clause does not apply.

Defendant argues the district court further erred in refusing to instruct the jury he had previously been acquitted of the false statements charge. "We review the district court's decision to give or to refuse a particular jury instruction for abuse of discretion." *United States v. Diaz*, 679 F.3d 1183, 1188 (10th Cir. 2012) (internal quotation marks omitted). Defendant requested this instruction after the district court had denied his motion and in the event the trial proceeded before Defendant was able to appeal the district court's ruling. He argued that a jury instruction, "at a minimum, is necessary in order to preserve [his] double jeopardy rights" and to "mitigate the prejudice at this juncture." (App. at 126, 127.) Because we agree with the district court's conclusion that the Double Jeopardy Clause did not bar admission of the false statement evidence, we conclude the district court did not abuse its discretion in refusing to give Defendant's proposed instruction regarding his acquittal on the false statements charge. Defendant offers no authority for his position that such an instruction is required.[7] *Cf. United States v. De La Rosa*, 171 F.3d 215, 220 (5th Cir. 1999)

---

[7] Defendant relies entirely upon *United States v. Rey*, No. CR 07-1761, 2010 WL 1141369 (D.N.M. Mar. 2, 2010) (unpublished), in which the district court gave the defendant's proposed instruction that the marijuana seized from his yurt was for personal use and not for distribution. However, the district court did not instruct the jury the defendant had previously been acquitted of possession

(continued...)

(holding "that an acquittal instruction is not required merely because evidence of acquitted conduct is introduced"); *United States v. Smith*, 145 F.3d 458, 462 (1st Cir. 1998) (same).

For the foregoing reasons, we affirm the district court's denial of Defendant's motion to exclude evidence regarding the false statements he allegedly made to the FBI agents.

### III. Motion for Judgment of Acquittal

We review the denial of Defendant's motion for judgment of acquittal de novo, viewing the evidence in the light most favorable to the government. *United States v. Austin*, 231 F.3d 1278, 1283 (10th Cir. 2000). "[R]eversal is only appropriate if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks omitted). "[W]hile the evidence supporting the conviction must be substantial and do more than raise a mere suspicion of guilt, it need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt." *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (internal citations and quotation marks omitted).

Defendant was charged with obstruction of justice in violation of 18 U.S.C.

---

[7](...continued)
with the intent to distribute. In fact, the district court specifically ordered the parties to avoid revealing to the jury the existence of the defendant's prior trial.

§ 1512(c)(2), which makes it a crime to corruptly obstruct, influence, or impede an official proceeding, or attempt to do so. 18 U.S.C. § 1512(c)(2). To sustain a conviction under § 1512(c)(2), the government does not need to prove the defendant knew of the existence of an ongoing official proceeding. *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009) (citing 18 U.S.C. § 1512(f)(1)). Nor does the government need to "prove the defendant knew that the official proceeding at issue was a federal proceeding such as a grand jury investigation." *Id.* at 1264-65 (citing 18 U.S.C. § 1512(g)(1)). "Rather, a conviction under the statute is proper if it is foreseeable that the defendant's conduct will interfere with an official proceeding." *Id.* at 1264. This has been referred to as the "nexus" requirement. *Id.*; *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995) (discussing the similar crime of obstructing or impeding the due administration of justice, 18 U.S.C. § 1503). A conviction is proper if there exists a nexus between the defendant's conduct and interference with the official proceeding—"if interference with the official proceeding is the 'natural and probable effect' of the defendant's conduct." *Phillips*, 583 F.3d at 1264 (quoting *Aguilar*, 515 U.S. at 601).

Defendant argues there was insufficient evidence to establish each of the elements required for a conviction.[8] We conclude a reasonable jury could

---

[8] The district court instructed the jury:

(continued...)

conclude Defendant obstructed, or attempted to obstruct, justice, in violation of 18 U.S.C. § 1512(c)(2), when he disclosed the existence of the ongoing undercover investigation of Car Shop to Mr. Bryan.

The jury heard testimony from Mr. Bryan that Defendant called him on the evening of September 22, 2009, and asked him to meet. Defendant told Mr. Bryan to walk outside of his gated community, walk east along the street, and put on a ball cap. Once Mr. Bryan was inside Defendant's vehicle, Defendant told Mr. Bryan he had "heard a rumor that [Mr. Bryan was] a sergeant major of a crime ring." (Supplemental App. at 942.) Defendant himself testified that at first Mr. Bryan did not believe what Defendant was telling him—that one of his mechanics was dealing drugs. It took Defendant "a little bit to convince him."

---

[8](...continued)
To find the defendant guilty of this crime, you must be convinced beyond a reasonable doubt: First: The defendant acted knowingly; Second: The defendant obstructed, influenced, or impeded, or attempted to obstruct, influence or impede, an official proceeding; Third: The defendant acted corruptly, that is, the defendant acted knowingly and dishonestly with the wrongful purpose to obstruct, influence, or impede the due administration of justice; Fourth: The defendant's alleged actions had a relationship in time, causation, or logic with the proceeding such that it was foreseeable that defendant's conduct would interfere with the proceeding. In other words, the government must prove to you beyond a reasonable doubt that obstruction of an official proceeding was the natural and probable outcome of defendant's conduct.
(Supplemental App. at 1220-21 (paragraph breaks omitted).) Although the instruction may be somewhat redundant, neither party challenged the instruction as given. We, therefore, do not have occasion to review the correctness of this instruction.

(*Id.* at 1178.)  Although there was conflicting testimony about what exactly

Defendant told Mr. Bryan, the jury heard testimony that Defendant informed Mr.

Bryan the APD and FBI were conducting an undercover operation at Car Shop,

Mr. Bryan was suspected of being the "sergeant major," or leader, of a criminal

organization (*id.* at 954), a Car Shop mechanic was dealing drugs and was "going

away" (*id.* at 1178), and Mr. Bryan "was being looked into" (*id.* at 946).  The jury

also heard testimony from Officer Olivas that he had shared many of these details

with Defendant the night before.  A rational juror could, therefore, find Defendant

obstructed or attempted to obstruct justice by disclosing details of the

investigation to Mr. Bryan.

The government offered evidence that, following Defendant's conversation

with Mr. Bryan, Defendant engaged in various acts demonstrating a guilty

conscience.  These included lying to the FBI, lying to Officer Olivas, asking for a

former APD officer's help in contacting Officer Olivas through his wife's phone,

and speaking in code with Mr. Bryan on Mr. Bryan's neighbor's phone.[9]  From

---

[9] We emphasize that this evidence was introduced as proof of Defendant's guilty conscience, to support a finding that he acted corruptly and with the intent to obstruct justice.  Defendant's actions in lying to the FBI are not the basis of the obstruction charge itself.  *See Aguilar*, 515 U.S. at 600 ("We do not believe that uttering false statements to an investigating agent . . . who might or might not testify before a grand jury is sufficient to make out a violation of the [similar] provision of § 1503.").  Rather, the government charged Defendant with obstructing justice by disclosing to Mr. Bryan the existence of the ongoing undercover investigation of Car Shop and Mr. Bryan.

this evidence, a rational juror could infer Defendant acted corruptly, that is with

"'the purpose of obstructing justice.'" *Erickson*, 561 F.3d at 1160 (quoting

*United States v. Rasheed*, 663 F.2d 843, 852 (9th Cir. 1981)).  Further supporting

this inference is the fact Defendant and Officer Olivas had previously discussed

how Defendant could tell Mr. Bryan that his son could no longer work at Car

Shop without raising suspicions.  Although he was able to do so using the story

he and Officer Olivas had prepared, Defendant felt it necessary to meet with Mr.

Bryan and inform him of the investigation because Defendant felt his friend was

"going to lose his whole business because he hired some less-than-credible guys."

(Supplemental App. at 1164.)

A rational juror could likewise conclude the natural and probable effect of

disclosing the existence of the ongoing undercover investigation of Car Shop to

Mr. Bryan was to impede a potential grand jury investigation.  The evidence and

reasonable inferences therefrom tended to show Defendant knew:  (1) the APD

and FBI were involved in the investigation of Car Shop; (2) the task force had

successfully purchased drugs from the Car Shop mechanic; (3) the task force was

using a confidential informant in the investigation; (4) there was a potential

financial investigation of Mr. Bryan; (5) "something was going to go down" soon

(*id.* at 956); and (6) the mechanic was "going away" (*id.* at 1178).  From this

evidence, a rational juror could conclude that there was the required nexus

between Defendant's conduct and a potential grand jury investigation.  *See*

-28-

*Phillips*, 583 F.3d at 1265 (holding nexus requirement satisfied where defendant knew the person making drug purchases was an undercover law enforcement officer, the officer had been or would be attempting to make controlled purchases, and at least two other drug distributers in the area had been arrested in the ten preceding months).  That commencement of a grand jury proceeding was foreseeable to Defendant is further supported by the government's evidence regarding Defendant's law enforcement experience and law enforcement officers' familiarity with grand jury proceedings.

We agree with the district court's conclusion that the government presented sufficient evidence from which the jury could find Defendant obstructed justice when he informed Mr. Bryan of the ongoing undercover investigation.

## CONCLUSION

For the foregoing reasons, we reject each of the challenges Defendant raises on appeal.  His conviction and sentence are **AFFIRMED**.