FILED
United States Court of Appeals
Tenth Circuit

March 19, 2014

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff-Appellant,

v.

RICK REESE, TERRI REESE, and
RYIN REESE,

        Defendants-Appellees.

No. 13-2037

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. No. 2:11-CR-02294-RB-001)**

---

Laura Fashing, Assistant United States Attorney, Albuquerque, New Mexico (Kenneth J. Gonzalez, United States Attorney, Albuquerque, New Mexico, with her on the briefs) for Plaintiff-Appellant.

Herbert W. Titus, William J. Olson, P.C., Vienna, Virginia (Robert J. Olson, William J. Olson, John S. Miles, Jeremiah L. Morgan, William J. Olson, P.C., Vienna, Virginia; Robert J. Gorence, Gorence & Oliveros, P.C., Albuquerque, New Mexico; Jason Bowles, Bowles Law Firm, Albuquerque, New Mexico; Michael Connelly, U.S. Justice Foundation, Ramona, California, with him on the briefs) for Defendants-Appellees.

---

Before **KELLY**, **EBEL**, and **PHILLIPS**, Circuit Judges.

---

**PHILLIPS**, Circuit Judge.

---

Rick Reese owned a federally licensed firearms store in southern New Mexico and ran it with his wife, Terri, and two sons, Ryin and Remington. In August 2012, a jury convicted Rick, Terri, and Ryin under 18 U.S.C. §§ 2 and 924(a)(1)(A) for aiding and

abetting straw purchases of firearms from the store. Unbeknownst to them, however, at the time of trial the FBI was investigating one of the government's witnesses for his alleged involvement in various criminal activities. Arguing that the government's failure to disclose that information before trial violated *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), Defendants filed a motion for a new trial. The district court concluded that the government had indeed withheld favorable, material evidence from Defendants and accordingly granted their motion. The question here is whether the district court erred in doing so. We think the answer to that question is yes because the investigation was not material—that is, there is not a reasonable probability that the trial's outcome would have been different had the government disclosed the investigation. We therefore reverse the district court's order and remand this case for further proceedings.

## FACTS

### 1. General Background

This story revolves around New Deal Shooting Sports, a gun store located near Deming, New Mexico, about 30 miles from the Mexican border. Rick Reese owned the store and operated it with his wife, Terri, and two sons, Ryin and Remington.[1] New Deal was a federally licensed firearms dealer, so to buy a firearm from New Deal a buyer had

---

[1] Because the Reese family members share the same surname, we'll use their first names.

to complete and sign under oath Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Form 4473.

Among other things, Form 4473 seeks to prevent straw purchases of firearms. A straw purchase occurs when a person falsely represents himself as the actual buyer of a firearm. *United States v. Garcia*, 635 F.3d 472, 475 (10th Cir. 2005). Generally, a straw purchaser buys firearms for another person who is prohibited from buying firearms or who doesn't want to be linked to those firearms. *Id.* To discourage straw purchasers, Question 11.a. on Form 4473 requires a prospective buyer to certify that he is the actual buyer. It explains that "[y]ou are not the actual buyer if you are acquiring the firearm(s) on behalf of another person. If you are not the actual buyer, the dealer cannot transfer the firearm(s) to you." App. vol. 15, at 3241. Form 4473 also illustrates a hypothetical straw purchase: "Mr. Smith asks Mr. Jones to purchase a firearm for Mr. Smith. Mr. Smith gives Mr. Jones the money for the firearm. Mr. Jones is not the actual transferee/buyer of the firearm and must answer 'no' to question 11.a. The licensee may not transfer the firearm to Mr. Jones." *Id.* at 3244 (emphases omitted).

We pause here to clarify terminology. Under Form 4473, a person is not the "actual buyer" if the person acquires a firearm for another, even if the person actually pays for the firearm. Rather, the "actual buyer" is the person the firearm ultimately is for. So, when we use "actual buyer" in this opinion, don't look exclusively at who actually paid for the firearm—focus instead on who the firearm was for.

Getting the terminology right is important because federal law prohibits straw purchasing. A person who certifies himself as the actual buyer on Form 4473 while

knowing that isn't true faces up to five years in prison. *See* 18 U.S.C. § 924(a)(1)(A); *United States v. Prince*, 647 F.3d 1257, 1268 (10th Cir. 2011).

## 2. The Investigations Leading to New Deal

The story began in January 2009 when Special Agent Eddie Pacheco, an investigator with Homeland Security Investigations (HSI), stopped a man named Jose Roman as he attempted to drive into Mexico at a border crossing. Agent Pacheco found two illegal aliens in Roman's car. For that reason, he started investigating Roman—a central figure in this case.

Fast forward to March 2010 when a woman named Penny Torres went to New Deal and paid cash for five AK-47-type rifles. A few months later, she visited again, putting down a $3000 cash deposit on ten more AK-47-type rifles. A few days later, she went to New Deal and picked up the rifles she had ordered.[2] On August 21, she bought another AK-47-type rifle from New Deal. Then on August 25, she bought seven AK-47-type pistols. This means Torres bought 23 firearms from New Deal in the span of about 6 months.

That spending spree turned out to be illegal. Two days after Torres's August 25 purchases, ATF sent Terri a fax requesting her help in tracing an AK-47-type rifle that law enforcement had recovered. The fax didn't say where the firearm had been recovered, but it did ask Terri to provide information about who had purchased the firearm. Terri

---

[2] Torres picked up the rifles on either July 3 or July 8. Someone might have altered Form 4473 to show her picking them up on July 8.

complied, informing ATF that the firearm was purchased from New Deal on July 8 by one Penny Torres.

Two days later, Terri called Deputy Allen Batts, a senior investigator with the Luna County Sheriff's Department. She asked if he could come by the store to pick up several multigun purchase forms. When Deputy Batts arrived, Terri pulled one of those forms out of the pile and said, "You need to look at this one." App. vol. 9, at 2401. That form reflected Torres's August 25 purchases. According to Terri, she called Deputy Batts because something about Torres's story didn't ring true.

The parties disagree about what else Terri said (or didn't say) to Deputy Batts that day. According to Deputy Batts, Terri told him that she had received a call from ATF saying that one of Torres's firearms had been recovered in Mexico. For her part, Terri denied saying anything about Mexico.

That dispute aside, no one disputes what Deputy Batts did next: He relayed the information about Torres to HSI. Based on that tip, HSI opened an official investigation of Torres, suspecting she was a straw purchaser for someone else.

That someone else turned out to be Jose Roman. In October 2010, an HSI agent saw Roman talking to two women who then got into Torres's car, which aroused suspicions that Roman and Torres were connected. A few days later, Agent Pacheco interviewed a woman who confirmed those suspicions by stating that Roman and Torres were indeed working together.

In December, HSI approached Torres, and she admitted she was a straw purchaser for Roman. Roman had coached her to tell the Reeses that she was purchasing firearms for

an uncle with a shooting range in Arizona. It's unclear whether Roman ever accompanied Torres into New Deal, but according to Torres, she—not Roman—would negotiate with Terri and Ryin regarding the firearms. Terri corroborated as much, stating that Torres knew exactly what kind of firearms she wanted, placed her orders, and paid with cash. Rick had similar recollections of Torres.

In January 2011, law-enforcement agents arrested Roman. He admitted that he worked for La Linea, the enforcement arm of the Juarez drug cartel in Mexico. He also admitted that in his work for La Linea he had purchased firearms and ammunition from New Deal and smuggled those items into Mexico.

Initially, the agents didn't believe the part of Roman's account implicating New Deal, so they tested it by having Roman make several recorded phone calls to the store. Terri answered on at least one occasion, and it was apparent that she and Roman knew each other. Roman's story now sounding more plausible, the government launched an undercover investigation of New Deal.

## 3. The Undercover Operations at New Deal

In total, the government conducted six undercover operations at New Deal as part of its investigation. The investigation's purpose, in part, was to determine if the Reeses were knowingly selling firearms to straw purchasers for Roman. To that end, Roman acted as the actual buyer during the operations while an undercover agent posed as his straw purchaser. The agent would fill out Form 4473, falsely certifying that the agent (not Roman) was the actual buyer. Roman never filled out Form 4473. Thus, the operations

tested whether the Reeses knew the firearms were for Roman (i.e., Roman was the actual buyer) but nonetheless assisted the agents in falsely stating otherwise on Form 4473.

*The First Operation*. On April 20, 2011, Roman went to New Deal with Daniel Ramirez, an undercover agent posing as Roman's straw purchaser. Neither Roman nor Agent Ramirez purchased any firearms during this operation.

*The Second Operation*. On May 19, Roman went back to New Deal with Agent Ramirez, who wore a hidden video recorder during the operation. Agent Ramirez paid Ryin in cash and filled out Form 4473 for three AR-15 rifles, two AK-47-type rifles, and 2000 rounds of ammunition. As Agent Ramirez was buying the firearms, Ryin asked him, "Is that weapon for you and you only?" App. vol. 8, at 1755. Ryin followed up, "If they're for anybody else, I cannot and will not sell them to you." *Id.* Based on Ryin's questioning, Agent Ramirez did not believe Ryin engaged in any criminal activity during this operation.

*The Third Operation*. On May 27, Roman again went to New Deal with Agent Ramirez. This time, Roman—not Agent Ramirez—wore the hidden audio-video recorder on his shirt. Roman said that he paid Ryin for the four AK-47-type rifles purchased during this operation, but Agent Ramirez was not certain about who paid. He also was not certain about whether Ryin knew Roman was the actual buyer (and Agent Ramirez the straw purchaser) during this operation. But he was certain that he filled out Form 4473. And it's clear that before leaving New Deal Roman ordered a .50-caliber rifle from Ryin and gave him $1000 as a down payment.

*The Fourth Operation*. On June 15, Roman went to New Deal with Agent Ramirez to pick up the .50-caliber. Roman wore the audio-video recorder. Roman counted out $3600 in cash to pay off the balance on the .50-caliber, handed the cash over to Ryin, and told him, "Always taking my money." Government Ex. 199 at 8:35–9:15; App. vol. 16, at 3334. Ryin explained Roman's receipt to him, and during that conversation Roman told Ryin about his plan to sell the .50-caliber in Mexico. Ryin replied, "I don't need to know that." Government Ex. 199 at 19:10–15; App. vol. 16, at 3343. After buying the .50-caliber, Roman told Ryin not to worry because even if law enforcement found the firearm in Mexico Roman had paid off the Mexican police. Specifically, Roman told Ryin that if the Mexican police found the .50-caliber in Mexico they would just give it back to Roman because he was bribing them with $5000 per month. Roman assured Ryin, "Nothing is gonna come back to you. You are safe." Government Ex. 199 at 28:05–15; App. vol. 15, at 3353–54. Agent Ramirez filled out Form 4473 for the .50-caliber with Ryin's assistance. Ryin watched as Agent Ramirez falsely certified that he was the .50-caliber's actual buyer.

Also during the June 15 operation, Roman ordered another .50-caliber from Ryin, and they discussed having a woman fill out the paperwork when it came in. Ryin had Terri order the .50-caliber for Roman, saying, "Mom, he wants another one." Government Ex. 199 at 44:55–57. As Roman was leaving New Deal, he reminded Ryin, "Order it, don't forget," to which Ryin replied, "I'll order it right now." App. vol. 16, at 3374–75.

*The Fifth Operation*. On July 7, Roman went back to New Deal with Agent Ramirez and Aida Cervera, a special agent with HSI, to pick up the .50-caliber rifle ordered on

- 8 -

June 15. As usual, Roman wore the audio-video recorder. After Ryin showed the rifle to Roman, Roman said, "I have the money. She's the one that's gonna want the paperwork. You want me to give to her, so she can pay it?" Government Ex. 201 at 2:18–30. Ryin nodded his head yes. Roman later told Ryin, "Like I'm saying, she's gonna [. . .] for the 50, and we need some AKs and ammunition." *Id.* at 7:59–8:10; App. vol. 16, at 3396. Ryin then pulled out an AK-47-type rifle and handed it to Roman. After Roman had selected two AK-47-type rifles, he negotiated the price with Ryin and Terri. Afterwards, Roman gave Agent Cervera $6000 in cash and she paid for the firearms. Ryin directed Agent Cervera to a computer where she could fill out Form 4473 electronically, and Ryin helped her fill it out. Agent Cervera filled out Form 4473 before even looking at the .50-caliber.

*The Sixth Operation.* On July 29, Roman went to New Deal with Agent Kelley Wigley, another special agent with HSI. Again, Roman wore the audio-video recorder. Shortly after arriving, Terri greeted them and asked how she could help. Agent Wigley pointed to Roman and said, "Whatever he wants." Government Ex. 203 at 3:20–23; App. vol. 9, at 1846; App. vol. 16, at 3463.

During the same operation, Roman explained to Rick that people in Mexico had told him to buy $24,000 in rifles and ammunition in the near future. Roman also told Rick that he was thinking about buying another .50-caliber rifle. Rick responded that New Deal had just received another .50-caliber and told Roman, "It's similar to your other [.50-caliber rifles]." Government Ex. 203 at 26:15–27; App. vol. 16, at 3503.

Later, Roman told Rick that he had about $2000 to spend and wanted three handguns. Roman picked out an AK-47-type pistol, handed it to Rick, and said he wanted two other handguns and that Agent Wigley would sign for them. Rick then asked Roman what kind of handguns he wanted; Roman said 9mm. Rick asked, "Any particular kind you like, man?" Government Ex. 203 at 31:47–53; App. vol. 16, at 3518. Rick proceeded to show Roman a few 9mm handguns.

After Roman had selected the firearms, he whispered to Rick, "She's going to pay." Government Ex. 203 at 36:20–22; App. vol. 16, at 3529. Roman then took some money out of his pocket and gestured in Agent Wigley's direction. Rick then nodded his head towards Agent Wigley and Roman handed her the money. Rick said, "[E]verything else will be fine, man. Everything's cool." Government Ex. 203 at 36:23–38; App. vol. 16, at 3529. Rick added, "You can have the young lady fill out the paperwork and we'll get you all set, bro." Government Ex. 203 at 38:00–05; App. vol. 16, at 3534. At that point, Rick showed Agent Wigley a computer where she could fill out Form 4473 electronically. Terri helped Agent Wigley fill it out.

### 4. The Indictment, the Trial, and the Verdict

About a month after the final operation, a grand jury returned a 30-count indictment against Rick, Terri, Ryin, and Remington. Count 1 charged them with conspiracy to make false statements in connection with the acquisition of firearms and with conspiracy to smuggle goods from the United States. Counts 2 through 8 charged Ryin with aiding and abetting straw purchases based on Torres's purchases and the undercover operations.

Counts 9 and 10 charged Rick and Terri, respectively, with aiding and abetting straw purchases during the July 29 undercover operation. Counts 11 through 28 charged aiding and abetting illegal smuggling of goods from the United States. Finally, counts 29 and 30 charged a money-laundering conspiracy.

The trial started in July 2012. After the government's case-in-chief, the district court granted a motion for acquittal on the money-laundering counts, reasoning that the government had presented no evidence proving an agreement to commit money laundering. The remaining counts went to the jury.

Ultimately, the jury found Ryin guilty on counts 7 and 8, Rick guilty on count 9, and Terri guilty on count 10. It acquitted on all other counts.

## 5. The Deputy Batts Investigation Comes to Light

Nearly four months after trial, the government filed an ex parte motion for an in camera inspection. The motion asked the district court to rule on the government's disclosure obligations regarding an FBI investigation of Deputy Batts. The documents showed that at the time of trial the FBI was investigating Deputy Batts for his alleged involvement in various criminal activities. The district court ordered the government to serve its motion on Defendants.[3]

After reviewing the documents, Defendants filed a motion for a new trial under Federal Rule of Criminal Procedure 33(b)(1). They argued that the government's failure

[3] To be fair, the two trial prosecutors weren't aware of the Deputy Batts investigation until after trial. And, to be fair to Deputy Batts, no charges have been brought against him.

to disclose the investigation violated *Brady* and entitled them to a new trial. Specifically, they argued that the FBI investigation was both favorable to them and material to their guilt. On favorability, they argued that the investigation gave Deputy Batts a motive to fabricate his testimony about Terri mentioning Mexico. According to them, Deputy Batts knew he was in trouble with the FBI because he had called the FBI and said he had built up a good reputation over his 20 years in law enforcement and had nothing to hide.[4] And, because he supposedly knew about the investigation, he had an incentive to ingratiate himself with the government in hopes of avoiding landing in the dock himself. In short, Defendants argued that the investigation was favorable to them because they could have used it to attack Deputy Batts's credibility. On materiality, Defendants argued that evidence impeaching Deputy Batts was material because he was a critical government witness.

The district court held an evidentiary hearing on Defendants' motion and ultimately granted it. The government disagreed with that resolution and filed a notice of appeal under 18 U.S.C. § 3731. That appeal is now before us.

## DISCUSSION

We begin with our standard of review. We then discuss the legal principles governing Defendants' *Brady* claim before turning to how those principles apply here. A brief conclusion follows.

---

[4] The report documenting Deputy Batts's call does not clearly show why he called or why he emphasized his clean reputation.

## 1. Standard of Review

Before reaching the merits, we need to settle our standard of review. In a long line of cases, we have held that in the new-trial context we review de novo a district court's ruling on a *Brady* claim, with any factual findings reviewed for clear error.[5]

That line notwithstanding, Defendants think we should review the district court's ruling here only for abuse of discretion. They point to a single case, *United States v. Robinson*, 39 F.3d 1115 (10th Cir. 1994), where we did in fact review a *Brady* claim in the new-trial context for abuse of discretion. *Id.* at 1116. But *Robinson* is an outlier. And we have held that where such an outlier exists—that is, when two panel decisions conflict—the earlier decision controls. *Hiller v. Oklahoma ex. rel. Used Motor Vehicle & Parts Comm'n*, 327 F.3d 1247, 1251 (10th Cir. 2003). Here, our decisions in *Bishop*, *Buchanan*, and *Hughes*—all of which applied the de novo standard—came before *Robinson*. So to the extent *Robinson* applied a different standard, it does not accurately reflect the law in this circuit.

In short, we take this opportunity to clarify and reiterate that we review de novo a district court's ruling on a *Brady* claim asserted in the context of a new-trial motion.

---

[5] *See United States v. Ahrensfield*, 698 F.3d 1310, 1319 (10th Cir. 2012); *United States v. Torres*, 569 F.3d 1277, 1281 (10th Cir. 2009); *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008); *United States v. Velarde*, 485 F.3d 553, 558 (10th Cir. 2007); *United States v. Pearl*, 324 F.3d 1210, 1215 (10th Cir. 2003); *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999); *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir. 1994); *United States v. Buchanan*, 891 F.2d 1436, 1440 (10th Cir. 1989); *United States v. Bishop*, 890 F.2d 212, 218 (10th Cir. 1989).

## 2. The Law Under *Brady*

The law governing *Brady* claims is well established: Due process requires a new trial if the government withholds evidence that is favorable to the defendant and material to guilt or punishment. *Smith v. Cain*, 132 S. Ct. 627, 630 (2012). A *Brady* claim consists of three elements, which the defendant must prove by a preponderance of the evidence: (1) the government suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material. *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008).

Evidence is *material* if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *Cain*, 132 S. Ct. at 630. A *reasonable probability* means the "likelihood of a different result is great enough to undermine confidence in the outcome." *Id.* (internal quotation marks omitted). Put another way, we ask whether the absence of the withheld evidence at trial "shakes our confidence in the guilty verdict." *United States v. Cooper*, 654 F.3d 1104, 1120 (10th Cir. 2011); *accord Kyles v. Whitley*, 514 U.S. 419, 434 (1995) ("A reasonable probability of a different result is accordingly shown when the government's evidentiary suppression undermines confidence in the outcome of the trial." (internal quotation marks omitted)). We determine materiality after reviewing the record as a whole. *Cooper*, 654 F.3d at 1120.

One observation on materiality: The test generally doesn't fluctuate with the government's culpability. Defendants believe that it does and suggest there's an inverse relationship between the two: the greater the government's culpability, the lesser the

defendant's burden on materiality. That suggestion, however, runs afoul of our caselaw. *See Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 823 (10th Cir. 1995) ("[I]t is irrelevant for *Brady* purposes whether the nondisclosure was the result of negligence or design." (internal quotation marks omitted)); *Buchanan*, 891 F.2d at 1442 ("The good faith or bad faith of the prosecutor has no bearing on the due process inquiry required by *Brady*."). It also runs afoul of *Brady*'s purpose, which is not to punish the misdeeds of the prosecutor, but to avoid an unfair trial. *Brady*, 373 U.S. at 87.

To be sure, a different standard might apply if the undisclosed evidence shows that the government knowingly used perjured testimony. *See United States v. Agurs*, 427 U.S. 97, 103–04 (1976). We don't reach that question here because even assuming a different standard applies in perjured-testimony cases, Defendants nowhere allege that the government withheld evidence of perjured testimony in this case. So, the general materiality standard applies here regardless of whether the government intentionally or negligently withheld the Deputy Batts investigation.

### 3. Analysis

Law in hand, we turn to its application. The first element of Defendants' *Brady* claim is not at issue; the government concedes it didn't disclose the FBI investigation of Deputy Batts before trial. And we don't concern ourselves with the second element; we assume (without deciding) that the investigation was favorable to Defendants. We focus instead on materiality and conclude that the Deputy Batts investigation was immaterial because

there is not a reasonable probability that the outcome of Defendants' trial would have been different had the government disclosed the investigation.

We take our major premise from the Supreme Court's decision in *Smith v. Cain*, where the Court stated that evidence impeaching a government witness may not be material if the government's other evidence is strong enough to sustain confidence in the verdict. 132 S. Ct. at 630. We think that statement captures this case.[6]

Before discussing the government's evidence, however, it's important to have a clear picture of what the government needed to prove. Defendants were convicted of aiding and abetting a person in knowingly making false statements under 18 U.S.C. §§ 2 and 924(a)(1)(A). Under § 924(a)(1)(A), the government must establish the following elements beyond a reasonable doubt: (1) the firearms dealer was a federally licensed firearms dealer when the offense occurred; (2) the defendant made a false statement in a record that federal law requires the dealer to maintain; and (3) the defendant made the false statement knowing it was false. *See United States v. Prince*, 647 F.3d 1257, 1268 (10th Cir. 2011).

---

[6] To be clear, we are not saying that no *Brady* violation occurred because there was *sufficient* evidence on the counts of conviction. The Supreme Court's teaching on that topic is unequivocal: Whether withheld evidence is material is not a sufficiency-of-the-evidence test. *Kyles*, 514 U.S. at 434–35 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."); *Ford*, 550 F.3d at 998 (Gorsuch, J., dissenting) ("A *Brady* challenge is not, and should not be confused with, a sufficiency of the evidence challenge—a point the Supreme Court has repeatedly underscored."). Instead, we're saying that no *Brady* violation occurred because there was *sufficiently strong* evidence on the counts of conviction to sustain our confidence in the jury's verdict despite the absence of the impeachment evidence at trial.

Here, no one disputes these elements are present: New Deal was at all relevant times a federally licensed firearms dealer; the undercover agents falsely stated that they were the actual buyers on Form 4473, a record federal law requires such dealers to maintain; and the undercover agents made those false statements knowingly.

That means the sole critical question at trial was whether Defendants aided and abetted the undercover agents—that is, whether they *knew* the agents were straw purchasers for Roman (i.e., the actual buyer) but helped the agents fill out Form 4473 saying otherwise. The government's evidence that they did know was sufficiently strong on the counts of conviction to sustain our confidence in the jury's verdict even assuming Defendants had used the FBI investigation to fuel a withering cross-examination of Deputy Batts.

## 3.1   Count 7

Let's begin with Ryin's conviction based on the June 15 operation (count 7). Strong evidence suggests that Ryin knew the .50-caliber purchased that day was for Roman:

- Roman—not Agent Ramirez—had ordered and paid Ryin the $1000 deposit on the .50-caliber during the previous operation.

- Roman—not Agent Ramirez—counted out $3600 in cash to pay off the balance on the .50-caliber, handed the money to Ryin, and said, "Always taking my money." Government Ex. 199 at 8:35–9:15; App. vol. 16, at 3334.

- Ryin explained the receipt to Roman—not Agent Ramirez.

- Roman told Ryin that he was taking the firearm to Mexico to sell it. Ryin replied, "I don't need to know that." Government Ex. 199 at 19:10–15; App. vol. 16, at 3343.

- Roman told Ryin not to worry because even if law enforcement found the firearm in Mexico Roman had paid off the Mexican police. Indeed, Roman told Ryin that if the Mexican police found the .50-caliber in Mexico they would just give it back to Roman because he was bribing them to the tune of $5000 per month.

- Roman assured Ryin, "Nothing is gonna come back to you. You are safe." Government Ex. 199 at 28:05–15; App. vol. 15, at 3353–54.

- Agent Ramirez filled out Form 4473 for the .50-caliber rifle, with Ryin's assistance.

All this adds up to damning evidence that Ryin knew Roman was the actual buyer of that .50-caliber yet helped Agent Ramirez state otherwise on Form 4473. On that basis, we are confident the jury would have returned a guilty verdict on count 7 even if Defendants had thoroughly impeached Deputy Batts.

## 3.2  Count 8

Next, consider Ryin's conviction based on the July 7 operation (count 8). The evidence suggesting that Ryin knew Roman was the actual buyer is similarly strong on this count:

- Similar to count 7, Roman—not Agent Ramirez or Agent Cervera—ordered the .50-caliber rifle purchased during this operation. Indeed, Ryin had Terri order it for Roman, saying, "Mom, he wants another one." Government Ex. 199 at 44:55–57.

- When Roman and the agents arrived on July 7, Ryin showed the .50-caliber to Roman—not Agent Cervera.

- Roman explicitly told Ryin, "I have the money. She's the one that's gonna want the paperwork. You want me to give to her, so she can pay it?" Government Ex. 201 at 2:18–30. Ryin nodded his head affirmatively.

- Roman—not Agent Cervera—worked with Ryin to select two AK-47-type rifles.

- Roman—not Agent Cervera—negotiated the price for the AK-47-type rifles with Ryin and Terri.

- Ryin helped Agent Cervera fill out Form 4473, falsely declaring herself as the actual buyer.

We find this to be similarly damning evidence that Ryin knew Roman was the actual buyer during the July 7 operation. After all, Roman ordered the .50-caliber on June 15, a day when Agent Cervera—the person the weapon supposedly was for—was not even in the store. And Agent Cervera filled out Form 4473 before even looking at the .50-caliber. What's more, at the very outset Roman told Ryin that he had the money for the .50-caliber but that Agent Cervera was going to fill out the paperwork. Put simply, this transaction should be the poster child for what a straw purchase looks like. Yet Ryin simply nodded his head, went along, and helped Agent Cervera fill out the paperwork. As a result, we're confident the jury would have returned a guilty verdict on count 8 even if Defendants had destroyed Deputy Batts's credibility on cross-examination.

### 3.3 Count 9

Now consider Rick's conviction based on the July 29 operation (count 9).

Roman's conversations with Rick strongly suggest that Rick knew Roman was the actual buyer. Roman explained to Rick that people in Mexico wanted him to spend $24,000 on rifles and ammunition in the near future. Roman also told Rick that he was considering buying another .50-caliber rifle. Rick said he had another .50-caliber "similar to your other [.50-caliber rifles]." Government Ex. 203 at 26:15–27; App. vol. 16, at

3503. Roman later told Rick that he had about $2000 on hand and wanted to buy three handguns.

Roman's dealings with Rick also strongly suggest that Rick knew Roman was the actual buyer. Just like count 8, where Roman worked with Ryin to select the firearms, on count 9 Roman worked with Rick to select the firearms. Roman picked out an AK-47-type pistol, handed it to Rick, and said he wanted two other handguns and that Agent Wigley would sign for them. Rick asked Roman—not Agent Wigley—what kind of handguns he wanted: "Any particular kind you'd like, man?" Government Ex. 203 at 31:47–53; App. vol. 16, at 3518. And Rick showed Roman—not Agent Wigley—several 9mm handguns.

Events at the checkout counter further showed Rick's knowledge that Roman was the actual buyer. After Roman selected the firearms, he whispered to Rick, "She's going to pay." Government Ex. 203 at 36:20–22; App. vol. 16, at 3529. Roman then took some money out of his pocket and gestured in Agent Wigley's direction. Rick then nodded his head toward Agent Wigley, and Roman handed her the money. Rick said, "Everything else will be fine, man. Everything's cool." Government Ex. 203 at 36:23–38; App. vol. 16, at 3529. Rick added, "You can have the young lady fill out the paperwork and we'll get you all set, bro." Government Ex. 203 at 38:00–05; App. vol. 16, at 3534. Rick then showed Agent Wigley a computer where she could fill out Form 4473 electronically.

This evidence depicts a classic straw purchase. Roman discussed buying the firearms with Rick, Roman selected the firearms, and Roman told Rick that Agent Wigley would fill out the paperwork. But most devastating for Rick, he watched as Roman pulled the

money out of his pocket and handed it over to Agent Wigley. In essence, Rick witnessed an obvious straw purchase but helped Agent Wigley with Form 4473 nonetheless. In light of that, we don't believe there is a reasonable probability that the jury's verdict on count 9 would have been different even if Defendants had been armed with the Deputy Batts investigation.

### 3.4  Count 10

Finally, turn to Terri's conviction based on the July 29 operation (count 10).

Terri knew that every single time Roman came into New Deal he was buying weapons for himself. The evidence leading up to the July 29 operation proves as much. For example, during the June 15 operation, Roman said to Terri, "This Ryin, he likes to take my money." Government Ex. 199 at 29:40–43. Terri responded, "He does, doesn't he?" *Id.* at 29:43–44. Roman replied, "Yeah, he loves to. He loves to." *Id.* at 29:44–46. So Terri likely knew as early as June 15 that Roman paid for the firearms when he came into New Deal.

There were more clues from June 15 as well. Near the end of that operation, Terri asked Roman if he wanted to order another .50-caliber rifle, suggesting that she knew Roman was the .50-caliber's actual buyer. Ryin affirmed this by saying, "Mom, he wants another one." *Id.* at 44:55–57. Roman affirmed it too, telling Terri, "I'll buy it. I'll buy it." *Id.* at 45:05–06. After Roman agreed to buy the .50-caliber, Terri took Roman's phone number as the person to call when it came in, providing further evidence that Terri considered Roman the actual buyer of that firearm. Terri also gave Roman an estimate of

how much it was going to cost. Accordingly, Terri ordered the .50-caliber rifle knowing Roman had requested it, had agreed to pay for it, and would pick it up when it came in. That's strong evidence that Roman was the .50-caliber's actual buyer, and Terri knew it.

Even more clues emerge from the July 7 operation. During that operation, Roman again said to Terri, "[Ryin's] taking my . . . money." Government Ex. 201 at 8:25–30. Terri responded, "I know, huh?" *Id.* Later, while Terri was negotiating the price for two firearms with Ryin and Roman, she said to Ryin, "I was going to give him [$]538 and give him an extra mag." *Id.* at 9:43–46; App. vol. 16, at 3399. Translation: Terri considered Roman the actual buyer and was willing to sell him the rifles for $538 each and throw in an extra magazine for good measure. Further, as Roman was buying .50-caliber ammunition, Terri asked him, "How about more ammo for your AK that you just bought?" Government Ex. 201 at 40:20–30; App. vol. 16, at 3436.

This wave of evidence against Terri reached its crest in one critical exchange during the July 29 operation. Shortly after Roman and Agent Wigley arrived, Terri greeted them and asked how she could help. Agent Wigley pointed at Roman and said, "Whatever he wants." Government Ex. 203 at 3:20–23; App. vol. 9, at 1846; App. vol. 16, at 3463.

Now, to her credit, Terri kept up the charade, pointed back at Agent Wigley, and said, "Whatever *you* want." Government Ex. 203 at 3:23–25. But at that point, the jig was up. Terri knew the firearms purchased that day would be for Roman; Agent Wigley had just said so. Thus, the only way Agent Wigley's purchases could have been legal is if Agent Wigley bought the firearms for Roman as a gift. App. vol. 15, at 3299 (explaining on Form 4473 that "[y]ou are also the actual transferee/buyer if you are legitimately

purchasing the firearm as a gift for a third party"). But Terri closed that escape hatch with her own testimony:

[MR. JORDAN]: Now, is it your testimony that Kelley was buying gifts for Roman?

TERRI REESE: No, sir. Kelley purchased firearms for herself.

App. vol. 12, at 2767. But Agent Wigley's statement put Terri on notice that those firearms *were not for* Agent Wigley. They were for Roman. Yet Terri still helped Agent Wigley certify that she was the actual buyer on Form 4473. Hence, we are confident that even a devastating cross-examination of Deputy Batts would not have changed the jury's verdict on count 10.

\* \* \*

In sum, we conclude that the Deputy Batts investigation was not material within the meaning of *Brady* because the government's evidence on the counts of conviction was sufficiently strong to sustain our confidence in the jury's verdict.

### 4. Defendants' Arguments

Defendants argue that the Deputy Batts investigation was material for two reasons. First, they argue that Deputy Batts was a critical government witness. Second, they argue that this was a close case—so close in fact that impeaching Deputy Batts might have tipped the scales in their favor at trial. We address those arguments in turn.

## 4.1 Critical Witness

Defendants attempt to draw succor from a line of our cases holding, generally, that evidence is material under *Brady* if it impeaches a critical government witness. *See, e.g.*, *United States v. Cooper*, 654 F.3d 1104, 1123 (10th Cir. 2011); *United States v. Torres*, 569 F.3d 1277, 1282–83 (10th Cir. 2009); *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009); *Nuckols v. Gibson*, 233 F.3d 1261, 1266–67 (10th Cir. 2000).

We don't think that rule helps Defendants' cause, however, because Deputy Batts was not a critical witness as our cases have used that term. In *Torres*, for example, we concluded there was a *Brady* violation because the government withheld evidence impeaching a confidential informant whose testimony was practically the only evidence linking the defendant to the crime. *Torres*, 569 F.3d at 1283–84. By contrast, here, the video evidence, not Deputy Batts's testimony, provided the principal link between the straw-purchase counts and Defendants. Simply put, our critical-witness cases are distinguishable.

Still, Defendants think Deputy Batts was a critical witness for two reasons. First, they say Deputy Batts was critical to establishing how the New Deal investigation began. But even spotting Defendants that much, it doesn't follow that he was a critical witness on the central issue at trial—whether Defendants knew the undercover agents were straw purchasers for Roman. Moreover, Deputy Batts's testimony constitutes marginal evidence that Defendants knew about the straw purchasers. As demonstrated above, the critical evidence on that score was the video evidence and the agents' testimony.

Second, Defendants argue that Deputy Batts must have been a critical witness because the government referred to him several times in closing arguments. A review of those closing arguments proves otherwise.

Deputy Batts played (at best) a minor role in the government's principal closing argument. The government emphasized the video evidence—not Deputy Batts's testimony—to prove that Defendants knew Roman was the actual buyer. *See, e.g.*, App. vol. 13, at 2895 ("I'm going to ask you to believe your own eyes and ears. Let's watch some of the recordings. Okay? Let's listen and watch."); *id.* at 2899 ("I don't have time to play all the recordings right now, but I encourage you . . . if you don't remember something, if you want to be sure, these exhibits are available to you. Go back there when you're deliberating and listen to the recordings, watch the recordings, and make up your own minds."); *id.* at 2895–2903 (playing video clips from the undercover operations). Indeed, Defendants concede that the video evidence took center stage during the government's principal closing argument. Appellees' Br. 47 (noting that the government "painstakingly [took] the jury through the audio and visual taped evidence"). In contrast, during its principal closing argument, the government mentioned Deputy Batts only once, and that was in connection with the conspiracy and smuggling counts, not the straw-purchase counts.

Although the government mentioned Deputy Batts a handful of times in its rebuttal closing, it did so not to prove Defendants' knowledge on the straw-purchase counts but in response to a challenge. During Defendants' closing argument, they tasked the government with explaining why Terri would have called Deputy Batts: "[H]ere's another

question to ask, and I hope [the government] can answer it. If these four members of this family were engaged in a conspiracy to commit crimes, why in the world would Terri Reese tip off the authorities to part of that activity?" App. vol. 13, at 2984. Answering that question in rebuttal, the government argued that Terri called Deputy Batts so that if things turned sour for her she could say she started the entire investigation. The government then referenced Deputy Batts to highlight that Terri had withheld certain information from him. But it did not reference him to prove Defendants' knowledge on the straw-purchase counts. For that, the government once again relied on the video evidence.

To sum up, Deputy Batts was not a critical witness under our caselaw, and we reject Defendants' arguments to the contrary.

### 4.2  Close Case

Defendants also argue that the Deputy Batts investigation was material because this was a close case as evidenced by the jury acquitting Defendants on 24 of the 28 counts before it. And, because this was a close case, they believe there is a reasonable probability that victory in the battle over Deputy Batts's credibility would have spelled victory in the entire war.

We have no quarrel with the rule Defendants invoke. No doubt, "[w]hat might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *Cooper*, 654 F.3d at 1120. But we do quarrel with the notion that

the rule does them any good. We aren't persuaded that the government's case was close on the counts of conviction.

Defendants' argument sweeps too broadly. Just because the jury acquitted on one count doesn't necessarily mean the government had a close case on a different count. *See Ford*, 550 F.3d at 988. Indeed, we have held that evidentiary weakness on one count does not imply evidentiary weakness on a different count if substantially different evidence underlies those counts. *Id.*

Here, the government's case was not as strong on the conspiracy count (count 1) and the smuggling counts (counts 11–28). But the evidentiary shortcomings on those counts didn't infect the straw-purchase counts. On the conspiracy count, for example, the government's best evidence of Defendants' agreement to violate the law was Special Agent Hector Huerta's testimony. He testified that during the June 15 operation he saw Rick, Terri, and Ryin huddled together talking, but he couldn't hear what they were saying. That's marginal evidence of a conspiracy, but it doesn't undermine the government's case on the straw-purchase counts. Similarly, on the smuggling counts, the government had to prove that Defendants knew Roman did not have a license to export goods from the United States to Mexico. At trial, however, the government offered little to no evidence that Defendants possessed such knowledge. Point is, this evidentiary weakness on the smuggling counts doesn't imply an evidentiary weakness on the straw-purchase counts.

The same idea applies to the straw-purchase counts themselves (counts 2–10); the jury received substantially different evidence on the counts of acquittal and the counts of

conviction. On counts 2 through 4, for instance, the jury did not have the benefit of video evidence, unlike on counts 5 through 10. Admittedly, counts 5 and 6 (where the jury acquitted) are a closer call because they bear more evidentiary similarities with the counts of conviction. Even so, we think the evidence on counts 5 and 6 was substantially different from the evidence on the counts of conviction.

On count 5 (the May 19 operation), Agent Ramirez testified that Ryin asked him, "Is that weapon for you and for you only?" App. vol. 8, at 1755. Ryin also said, "If they're for anybody else, I cannot and will not sell them to you." *Id.* Agent Ramirez conceded that, because Ryin had assured himself that Agent Ramirez was the actual buyer, Ryin didn't do anything illegal that day. In effect, Agent Ramirez—the government's own witness—testified that Ryin was not guilty on count 5. And on count 6 (the May 27 operation), Agent Ramirez's testimony was confusing about who paid for the firearms that day and whether Ryin knew those firearms were for Roman.

But the jury received substantially different evidence on counts 7 through 10 (the counts of conviction). To start, on those counts Agent Ramirez did not provide similar testimony to that recited above. Count 7 (the June 15 operation) also differed from counts 5 and 6 because the jury saw video evidence of Roman ordering the .50-caliber rifle, paying for it himself, telling Ryin that he was taking it to Mexico to sell it, and assuring Ryin that he needn't worry because Roman had bribed the Mexican police.

The evidence on count 8 was substantially different from counts 5 and 6 as well. For count 8, the jury saw video evidence of Roman picking up a .50-caliber rifle that he had ordered at a time when Agent Cervera—the person signing for it—was not even in the

store. The jury also watched as Roman explicitly told Ryin that he had the money but that Agent Cervera would fill out Form 4473.

The evidence tells the same story on counts 9 and 10. The jury watched as Roman whispered to Rick that Agent Wigley would pay for the firearms he had selected. It also heard that Roman handed her the cash for the firearms while Rick was watching. And the jurors watched as Agent Wigley pointed to Roman and told Terri, "Whatever he wants." Government Ex. 203 at 3:20–23.

At bottom, that the jury acquitted Defendants on 24 of 28 counts doesn't mean the government had a close case on the counts of conviction; the evidence on the counts of conviction was substantially different from the evidence on the counts of acquittal. In short, this was not such a close case that we lack confidence in the jury's verdict.

## CONCLUSION

Having reviewed the record, we conclude there is not a reasonable probability that the outcome of Defendants' trial would have been different had the government disclosed the Deputy Batts investigation. Because the investigation was thus not material under *Brady*, the district court erred in granting Defendants' new-trial motion. We therefore reverse the district court's order granting Defendants a new trial and remand this case to the district court for further proceedings.[7]

---

[7] We grant the government's motion to file a supplemental appendix.